THOMAS ET AL. *v.* CHICAGO PARK DISTRICT

No. 00–1249.   Argued December 3, 2001—Decided January 15, 2002

SCALIA, J., delivered the opinion for a unanimous Court.

*Richard L. Wilson* argued the cause for petitioners. With him on the briefs were *Wayne B. Giampietro* and *Michael J. Merrick.*

*David A. Strauss* argued the cause for respondent. With him on the brief was *Steven A. Weiss.*

*James A. Feldman* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Olson, Acting Assistant Attorney General Schiffer, Deputy Solicitor General Kneedler, Stephanie R. Marcus, William G. Myers III,* and *Randolph J. Myers.**

JUSTICE SCALIA delivered the opinion of the Court.

This case presents the question whether a municipal park ordinance requiring individuals to obtain a permit before conducting large-scale events must, consistent with the First Amendment, contain the procedural safeguards described in *Freedman* v. *Maryland,* 380 U. S. 51 (1965).

---

*\*Bonnie I. Robin-Vergeer* and *Alan B. Morrison* filed a brief for Public Citizen, Inc., as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the City of New York by *Michael D. Hess,* Corporation Counsel, *Leonard J. Koerner,* and *Elizabeth I. Freedman;* for the International City-County Management Association et al. by *Richard Ruda* and *Charles A. Rothfeld;* for the International Municipal Lawyers Association by *Henry W. Underhill, Jr.;* and for Morality in Media, Inc., et al. by *Robin S. Whitehead* and *Bruce A. Taylor.*

# I

Respondent, the Chicago Park District (Park District), is responsible for operating public parks and other public property in Chicago. See Ill. Comp. Stat., ch. 70, § 1505/7.01 (2001). Pursuant to its authority to "establish by ordinance all needful rules and regulations for the government and protection of parks . . . and other property under its jurisdiction," § 1505/7.02, the Park District adopted an ordinance that requires a person to obtain a permit in order to "conduct a public assembly, parade, picnic, or other event involving more than fifty individuals," or engage in an activity such as "creat[ing] or emit[ting] any Amplified Sound." Chicago Park Dist. Code, ch. VII, §§ C.3.a(1), C.3.a(6). The ordinance provides that "[a]pplications for permits shall be processed in order of receipt," § C.5.a, and the Park District must decide whether to grant or deny an application within 14 days unless, by written notice to the applicant, it extends the period an additional 14 days, § C.5.c. Applications can be denied on any of 13 specified grounds. § C.5.e.[1] If the Park

---

[1] Section C.5.e of the ordinance provides in relevant part:

"To the extent permitted by law, the Park District may deny an application for permit if the applicant or the person on whose behalf the application for permit was made has on prior occasions made material misrepresentations regarding the nature or scope of an event or activity previously permitted or has violated the terms of prior permits issued to or on behalf of the applicant. The Park District may also deny an application for permit on any of the following grounds:

"(1) the application for permit (including any required attachments and submissions) is not fully completed and executed;

"(2) the applicant has not tendered the required application fee with the application or has not tendered the required user fee, indemnification agreement, insurance certificate, or security deposit within the times prescribed by the General Superintendent;

"(3) the application for permit contains a material falsehood or misrepresentation;

"(4) the applicant is legally incompetent to contract or to sue and be sued;

"(5) the applicant or the person on whose behalf the application for permit was made has on prior occasions damaged Park District

District denies an application, it must clearly set forth in writing the grounds for denial and, where feasible, must propose measures to cure defects in the application. §§ C.5.d, C.5.e. When the basis for denial is prior receipt of a competing application for the same time and place, the Park District must suggest alternative times or places. § C.5.e. An unsuccessful applicant has seven days to file a written appeal to the General Superintendent of the Park District, who must act on the appeal within seven days. § C.6.a. If the General Superintendent affirms a permit denial, the applicant may seek judicial review in state court by common-law certiorari. See *Norton* v. *Nicholson*, 187 Ill. App. 3d 1046, 1057–1058, 543 N. E. 2d 1053, 1059 (1989).

Petitioners have applied to the Park District on several occasions for permits to hold rallies advocating the legal-

---

property and has not paid in full for such damage, or has other outstanding and unpaid debts to the Park District;

"(6) a fully executed prior application for permit for the same time and place has been received, and a permit has been or will be granted to a prior applicant authorizing uses or activities which do not reasonably permit multiple occupancy of the particular park or part hereof;

"(7) the use or activity intended by the applicant would conflict with previously planned programs organized and conducted by the Park District and previously scheduled for the same time and place;

"(8) the proposed use or activity is prohibited by or inconsistent with the classifications and uses of the park or part thereof designated pursuant to this chapter, Section C.1., above;

"(9) the use or activity intended by the applicant would present an unreasonable danger to the health or safety of the applicant, or other users of the park, of Park District Employees or of the public;

"(10) the applicant has not complied or cannot comply with applicable licensure requirements, ordinances or regulations of the Park District concerning the sale or offering for sale of any goods or services;

"(11) the use or activity intended by the applicant is prohibited by law, by this Code and ordinances of the Park District, or by the regulations of the General Superintendent . . . ."

ization of marijuana. The Park District has granted some permits and denied others. Not satisfied, petitioners filed an action pursuant to 42 U. S. C. § 1983 in the United States District Court for the Northern District of Illinois, alleging, *inter alia*, that the Park District's ordinance is unconstitutional on its face. The District Court granted summary judgment in favor of the Park District, and the United States Court of Appeals for the Seventh Circuit affirmed. 227 F. 3d 921 (2000). We granted certiorari. 532 U. S. 1051 (2001).

## II

The First Amendment's guarantee of "the freedom of speech, or of the press" prohibits a wide assortment of government restraints upon expression, but the core abuse against which it was directed was the scheme of licensing laws implemented by the monarch and Parliament to contain the "evils" of the printing press in 16th- and 17-century England. The Printing Act of 1662 had "prescribed what could be printed, who could print, and who could sell." Mayton, Toward a Theory of First Amendment Process: Injunctions of Speech, Subsequent Punishment, and the Costs of the Prior Restraint Doctrine, 67 Cornell L. Rev. 245, 248 (1982). It punished the publication of any book or pamphlet without a license and required that all works be submitted for approval to a government official, who wielded broad authority to suppress works that he found to be " 'heretical, seditious, schismatical, or offensive.' " F. Siebert, Freedom of the Press in England, 1476–1776, p. 240 (1952). The English licensing system expired at the end of the 17th century, but the memory of its abuses was still vivid enough in colonial times that Blackstone warned against the "restrictive power" of such a "licenser"—an administrative official who enjoyed unconfined authority to pass judgment on the content of speech. 4 W. Blackstone, Commentaries on the Laws of England 152 (1769).

In *Freedman* v. *Maryland,* 380 U. S. 51 (1965), we confronted a state law that enacted a strikingly similar system of prior restraint for motion pictures. It required that every motion picture film be submitted to a Board of Censors before the film was shown anywhere in the State. The board enjoyed authority to reject films that it considered "'obscene'" or that "'tend[ed], in the judgment of the Board, to debase or corrupt morals or incite to crimes,'" characteristics defined by the statute in broad terms. *Id.,* at 52, n. 2. The statute punished the exhibition of a film not submitted to the board for advance approval, even where the film would have received a license had it been properly submitted. It was no defense that the content of the film was protected by the First Amendment.

We recognized in *Freedman* that a scheme conditioning expression on a licensing body's prior approval of content "presents peculiar dangers to constitutionally protected speech." *Id.,* at 57. "[T]he censor's business is to censor," *ibid.,* and a licensing body likely will overestimate the dangers of controversial speech when determining, without regard to the film's actual effect on an audience, whether speech is likely "'to incite'" or to "'corrupt [the] morals,'" *id.,* at 52–53, n. 2. Cf. *Southeastern Promotions, Ltd.* v. *Conrad,* 420 U. S. 546, 561, and n. 11 (1975). In response to these grave "dangers of a censorship system," *Freedman, supra,* at 58, we held that a film licensing process must contain certain procedural safeguards in order to avoid constituting an invalid prior restraint: "(1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court." *FW/PBS, Inc.* v. *Dallas,* 493 U. S. 215, 227 (1990) (principal opinion of O'CONNOR, J., joined by STEVENS and KENNEDY, JJ.) (citing *Freedman, supra,* at 58–60).

Petitioners contend that the Park District, like the Board of Censors in *Freedman,* must initiate litigation every time it denies a permit and that the ordinance must specify a deadline for judicial review of a challenge to a permit denial. We reject those contentions.. *Freedman* is inapposite because the licensing scheme at issue here is not subject-matter censorship but content-neutral time, place, and manner regulation of the use of a public forum. The Park District's ordinance does not authorize a licensor to pass judgment on the content of speech: None of the grounds for denying a permit has anything to do with what a speaker might say. Indeed, the ordinance (unlike the classic censorship scheme) is not even directed to communicative activity as such, but rather to *all* activity conducted in a public park. The picnicker and soccer player, no less than the political activist or parade marshal, must apply for a permit if the 50-person limit is to be exceeded. And the object of the permit system (as plainly indicated by the permissible grounds for permit denial) is not to exclude communication of a particular content, but to coordinate multiple uses of limited space, to assure preservation of the park facilities, to prevent uses that are dangerous, unlawful, or impermissible under the Park District's rules, and to assure financial accountability for damage caused by the event. As the Court of Appeals well put it: "[T]o allow unregulated access to all comers could easily reduce rather than enlarge the park's utility as a forum for speech." 227 F. 3d, at 924.

We have never required that a content-neutral permit scheme regulating speech in a public forum adhere to the procedural requirements set forth in *Freedman.*[2] "A licensing standard which gives an official authority to censor the content of a speech differs *toto coelo* from one limited by its terms, or by nondiscriminatory practice, to considerations

---

[2] *FW/PBS, Inc.* v. *Dallas,* 493 U. S. 215, 224 (1990), which applied two of the *Freedman* requirements, involved a licensing scheme that "target[ed] businesses purveying sexually explicit speech."

of public safety and the like." *Niemotko* v. *Maryland,* 340 U. S. 268, 282 (1951) (Frankfurter, J., concurring in result). "[T]he [permit] required is not the kind of prepublication license deemed a denial of liberty since the time of John Milton but a ministerial, police routine for adjusting the rights of citizens so that the opportunity for effective freedom of speech may be preserved." *Poulos* v. *New Hampshire,* 345 U. S. 395, 403 (1953). Regulations of the use of a public forum that ensure the safety and convenience of the people are not "inconsistent with civil liberties but . . . [are] one of the means of safeguarding the good order upon which [civil liberties] ultimately depend." *Cox* v. *New Hampshire,* 312 U. S. 569, 574 (1941). Such a traditional exercise of authority does not raise the censorship concerns that prompted us to impose the extraordinary procedural safeguards on the film licensing process in *Freedman.*

## III

Of course even content-neutral time, place, and manner restrictions can be applied in such a manner as to stifle free expression. Where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content. See *Forsyth County* v. *Nationalist Movement,* 505 U. S. 123, 131 (1992). We have thus required that a time, place, and manner regulation contain adequate standards to guide the official's decision and render it subject to effective judicial review. See *Niemotko, supra,* at 271. Petitioners contend that the Park District's ordinance fails this test.[3]

---

[3] Petitioners do not argue that the Park District's ordinance fails to satisfy other requirements of our time, place, and manner jurisprudence, under which the permit scheme "must not be based on the content of the message, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication." *Forsyth County* v. *Nationalist Movement,* 505 U. S. 123, 130 (1992); see also *Clark* v. *Community for Creative Non-Violence,* 468 U. S. 288, 293 (1984).

We think not. As we have described, the Park District may deny a permit only for one or more of the reasons set forth in the ordinance. See n. 1, *supra*. It may deny, for example, when the application is incomplete or contains a material falsehood or misrepresentation; when the applicant has damaged Park District property on prior occasions and has not paid for the damage; when a permit has been granted to an earlier applicant for the same time and place; when the intended use would present an unreasonable danger to the health or safety of park users or Park District employees; or when the applicant has violated the terms of a prior permit. See Chicago Park Dist. Code, ch. VII, § C.5.e. Moreover, the Park District must process applications within 28 days, § C.5.c, and must clearly explain its reasons for any denial, § C.5.e. These grounds are reasonably specific and objective, and do not leave the decision "to the whim of the administrator." *Forsyth County*, 505 U. S., at 133. They provide " 'narrowly drawn, reasonable and definite standards' " to guide the licensor's determination, *ibid.* (quoting *Niemotko, supra*, at 271). And they are enforceable on review—first by appeal to the General Superintendent of the Park District, see Chicago Park Dist. Code, ch. VII, § C.6.a, and then by writ of common-law certiorari in the Illinois courts, see *Norton* v. *Nicholson*, 187 Ill. App. 3d 1046, 543 N. E. 2d 1053 (1989), which provides essentially the same type of review as that provided by the Illinois administrative procedure act, see *Nowicki* v. *Evanston Fair Housing Review Bd.*, 62 Ill. 2d 11, 14, 338 N. E. 2d 186, 188 (1975).

Petitioners contend that the criteria set forth in the ordinance are insufficiently precise because they are described as grounds on which the Park District "may" deny a permit, rather than grounds on which it *must* do so. This, they contend, allows the Park District to waive the permit requirements for some favored speakers, while insisting upon them for others. That is certainly not the intent of the ordinance, which the Park District has reasonably interpreted

to permit overlooking only those inadequacies that, under the circumstances, do no harm to the policies furthered by the application requirements. See Tr. of Oral Arg. 31–32. Granting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional, but we think that this abuse must be dealt with if and when a pattern of unlawful favoritism appears, rather than by insisting upon a degree of rigidity that is found in few legal arrangements. On petitioners' theory, every obscenity law, or every law placing limits upon political expenditures, contains a constitutional flaw, since it merely permits, but does not require, prosecution. The prophylaxis achieved by insisting upon a rigid, no-waiver application of the ordinance requirements would be far outweighed, we think, by the accompanying senseless prohibition of speech (and of other activity in the park) by organizations that fail to meet the technical requirements of the ordinance but for one reason or another pose no risk of the evils that those requirements are designed to avoid. On balance, we think the permissive nature of the ordinance furthers, rather than constricts, free speech.

\* \* \*

Because the Park District's ordinance is not subject to *Freedman*'s procedural requirements, we do not reach one of the questions on which we granted certiorari, and on which the Courts of Appeals are divided: whether the requirement of prompt judicial review means a prompt judicial determination or the prompt commencement of judicial proceedings. Compare *Nightclubs, Inc.* v. *Paducah*, 202 F. 3d 884, 892–893 (CA6 2000); *Baby Tam & Co.* v. *Las Vegas*, 154 F. 3d 1097, 1101 (CA9 1998); *11126 Baltimore Blvd., Inc.* v. *Prince George's County*, 58 F. 3d 988, 998–1001 (CA4 1995) (en banc), with *Boss Capital, Inc.* v. *Casselberry*, 187 F. 3d 1251, 1255–1257 (CA11 1999); *TK's Video, Inc.* v. *Denton County*, 24 F. 3d 705, 709 (CA5 1994); *Graff* v. *Chicago*, 9

F. 3d 1309, 1324–1325 (CA7 1993) (en banc); *Jews for Jesus, Inc.* v. *Massachusetts Bay Transp. Authority*, 984 F. 2d 1319, 1327 (CA1 1993). For the foregoing reasons, we affirm the judgment of the Court of Appeals.

*It is so ordered.*