**FEED THE CHILDREN, INC., Plaintiff,**

v.

**The METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY and Iris Buhl, Chairman of the Solicitations Board of the Metropolitan Government of Nashville and Davidson County, Defendants.**

No. 3:01–1484.

United States District Court,
M.D. Tennessee,
Nashville Division.

March 21, 2002.

J. Richard Lodge, Bass, Berry & Sims, Nashville, TN, James A. Ikard, Oklahoma City, OK, for Feed the Children, Inc., a not for profit corporation, pltf.

Francis Howard Young, Kelli A. Haas, Metropolitan Legal Department, Nashville, TN, for Metropolitan Government of Nashville and Davidson County, Tennessee, Iris Buhl, Chairman of the Solicitations Board of the Metropolitan Government of Nashville and Davidson County, TN, defts.

## MEMORANDUM

ECHOLS, District Judge.

Presently pending before the Court is Plaintiff's Motion for a Preliminary Injunction (Docket Entry No. 32), to which Defendants respond in opposition. The Court heard oral arguments on January 17, 2002. For the reasons explained herein, the Motion for a Preliminary Injunction (Docket Entry No. 32) will be GRANTED.

### I.

Plaintiff Feed the Children, Inc., has filed suit against the Metropolitan Government of Nashville and Davidson County ("Metro Government") and the Chairman of its Solicitations Board, Iris Buhl. Plaintiff alleges six causes of action: (1) "violation of First and Fourteenth Amendments," (2) "vagueness and overbreadth, violation of First and Fourteenth Amendments," (3) "violation of Commerce Clause," (4) "federal preemption," (5) deprivation of constitutional rights pursuant to 42 U.S.C. § 1983, and (6) "injunctive relief." Plaintiff seeks a declaratory judgment that the Metro Government's Charitable Solicitations Ordinance, Nashville & Davidson County, Tenn., Metro. Code §§ 6.64.070–6.64.230 (1999), is unconstitutional; preliminary and permanent injunctions to prevent Defendants from enforcing the Charitable Solicitations Ordinance;

attorney fees; and costs. Plaintiff now moves for a preliminary injunction to prevent Defendants from enforcing the Charitable Solicitations Ordinance. This Court has federal question jurisdiction over all claims, see 28 U.S.C. § 1331 (1994), and civil rights jurisdiction over the Section 1983 claim, see 28 U.S.C. § 1343 (1994).

## II.

The facts material to this motion do not appear to be in dispute. Plaintiff is a nonprofit charitable organization headquartered in Oklahoma City, Oklahoma, that provides aid to needy individuals all over the world. Plaintiff solicits contributions via local and national television advertisements, direct mail, an Internet web site, and in-person solicitations. Defendant Metro Government is a municipal corporation, and Defendant Iris Buhl is the Chairman of the Charitable Solicitations Board ("the Board"), a subdivision of Defendant Metro Government.

## A. THE CHARITABLE SOLICITATIONS ORDINANCE

Defendant Metro Government's City Council enacted the Charitable Solicitations Ordinance to regulate charitable solicitations in Davidson County. The Board exists pursuant to the Charitable Solicitations Ordinance. See Metro. Code § 6.64.080(A). The Board is responsible for issuing permits to charitable organizations that wish to solicit donations in Davidson County. See Metro. Code § 6.64.080(E). As a general rule, no one is permitted to solicit contributions in Davidson County for any charitable purpose without such a permit. See Metro. Code § 6.64.100(A).[1] The Metro Code provides penalties for violating this prohibition, as well as any other provision of the Charitable Solicitations Ordinance:

> Any person violating any of the provisions of this article … shall be deemed guilty of a misdemeanor and, upon conviction thereof, shall be fined not less than twenty-five dollars nor more than fifty dollars. Each solicitation which occurs in violation of this article shall be deemed a separate offense.

Metro.Code § 6.64.230. The Board is also empowered to suspend and, after a hearing, revoke a permit for violation of the Charitable Solicitations Ordinance. See Metro. Code § 6.6.4.180.

An application for a permit must include a variety of information, most of which is listed as twenty separate items in the Charitable Solicitations Ordinance. See Metro. Code § 6.64.110(1)-(20). Among them is a statement of the "purpose for which such solicitation is to be made, the total amount of funds proposed to be raised thereby, and the use or disposition to be made of any receipts therefrom." Metro. Code § 6.64.110(A)(3). An application must include a "specific statement, supported by reasons and, if available, figures showing the need for the contributions to be solicited." Metro. Code § 6.64.110(A)(4). An application must also include detailed financial information such as an estimated cost of the solicitation, see Metro. Code § 6.64.110(A)(9), the amount of any wages paid to solicitors and the solicitors' names and addresses, see Metro. Code § 6.64.110(A)(10), financial statements from fundraising activities in previous years, see Metro. Code § 6.64.110(A)(11), and the ratio of the estimated cost of the solicitation to the gross

---

1. Religious institutions, educational organizations, groups that solicit less than $5,000 per year, and groups that solicit only their membership are exempt from the permit requirement, although educational organizations and groups that solicit less that $5,000 per year have other filing requirements. Plaintiff in this case does not contend that it falls within any of the exceptions.

revenues projected to be derived from the solicitation, *see* Metro. Code § 6.64.110(A)(13).[2] The application must include a "full statement of the character and extent of the charitable work being done by the applicant within the area of the metropolitan government." Metro. Code § 6.64.110(A)(12). If the applicant intends to solicit by telephone, "a copy of the script that is intended to be used shall be provided to the board at the same time the application for a permit is filed." Metro. Code § 6.64.160(H). Finally, the application must include "[s]uch other information as may reasonably be required by the board in order to determine the kind and character of the proposed solicitation, and whether such solicitation is in the interest of, and not inimical to, the public welfare." Metro. Code § 6.64.110(A)(17). The Charitable Solicitation Ordinance declares that all of the aforementioned information is to be considered a matter of public record under Tenn.Code Ann. § 10–7–101. *See* Metro. Code § 6.64.200.

In addition to the above information, an applicant must also pay a fee, either $50 or $100, depending on the amount of funds the applicant intends to solicit. *See* Metro. Code § 6.64.140. Once the application and fee are on file, the applicant is required to appear in person before the Board, *see* Metro. Code § 6.64.110(A)(21)(a), but the Board may waive the personal appearance requirement, *see* Metro Code § 6.64.110(A)(21)(b). Furthermore. "[i]f, while any application is pending, or during the term of any permit granted thereon, there is any change of fact, policy or method that would alter the information given in the application, the applicant shall notify the board in writing thereof within twenty-four hours after such change." Metro. Code § 6.64.110(B).

The Board must examine every application and make "such further investigation of the application and the applicant as the board shall deem necessary." Metro. Code § 6.64.120(A). Moreover, the Board may require an applicant to "make available for inspection all of the applicant's books, records and papers at any reasonable time before the application is granted during the pendency of the application before the board, during the time the permit is in effect, or after a permit has expired." *Id.*

In determining whether to grant or deny a permit, the Board is to consider five factors:

1. Whether the charitable organizations and their professional solicitors, if any, have complied with all applicable ordinances of the metropolitan government;

2. The truthfulness of the statements made in the application;

3. The character and reputation for honesty and integrity of the applicant;

4. Provisions established by the applicant for control and supervision of the solicitation;

5. Whether the applicant has engaged in any fraudulent transaction or enterprise to the best of the board's knowledge, information and belief.

Metro.Code § 6.64.130(A). The Solicitations Board is required to create a written statement of its findings of fact and its decision "upon any application." Metro. Code § 6.64.130(B).

If the Board denies an application, the applicant has a right to a public hearing before the Board, but the applicant must request the hearing in writing within five "working days" of receiving notice of the

---

**2.** Permit holders are also required to submit various financial data, *see* Metro. Code § 6.64.190, including "a detailed report and

financial statement prepared by either a certified public accountant or a licensed public accountant ...." Metro Code. § 6.64.190(A).

Board's decision. *See* Metro. Code § 6.64.170(A). The Board must hold the hearing within thirty days of receiving the applicant's request, and the Board must render its final decision in writing within thirty days of the hearing. *See* Metro. Code § 6.64.170(B). If the Board again denies the application, the Board's decision "may be reviewed by statutory writ of certiorari with a trial de novo as a substitute for an appeal, such writ of certiorari to be addressed to the circuit or chancery court of Davidson County." Metro. Code § 6.64.210(A). The Board is responsible for providing the court with a copy of the hearing transcript. *See* Metro. Code § 6.64.210(B). An applicant who loses in chancery or circuit court may appeal to the Tennessee Supreme Court. *See* Metro. Code § 6.64.210(C).[3]

In 1980, a religious organization filed suit in this District challenging the Charitable Solicitations Ordinance under the First and Fourteenth Amendments to the Constitution. Judge L. Clure Morton issued a published opinion, *Sylte v. Metropolitan Government of Nashville and Davidson County*, 493 F.Supp. 313 (M.D.Tenn.1980), finding that the Charitable Solicitations Ordinance was unconstitutional and permanently enjoined the Metro Government from enforcing it against religious organizations. The Charitable Solicitations Ordinance has been amended six times since *Sylte*. The most significant changes came in 1990 when religious organizations were exempted from the permit requirement and the five factors for the Board to consider in deciding whether to grant a permit were added.

### B. THE CHARITABLE SOLICITATIONS BOARD IN PRACTICE

The Board meets monthly, generally on the last Thursday of every month. In the almost six years from 1996 through 2001,

the Board considered 1,661 applications for permits. Of those, the Board approved 1,657 and denied four. All four were denied because the applicant had failed to provide the required financial documentation even after having been given additional time to do so. In three of the four cases, the Board initially granted a provisional license, subject to the receipt of the proper documents, and then denied the application only when the documents were not received. The Board did not revoke or suspend a permit anytime between 1996 and 2001.

In most respects, it appears that the Board functions in the manner the Charitable Solicitations Ordinance requires. One exception is the requirement that the Board create a written statement of its findings of fact and its decision "upon any application" for a permit. *See* Metro. Code § 6.64.130(B). Counsel for Defendants candidly acknowledged at oral argument that the Board does not create any such statement but simply votes "thumbs up" or "thumbs down" on each application.

Another possible diversion from the statute is the Board's web site, on which the Board maintains a list of charitable organizations with a valid permit on file. Defendants have appended the word "ALERT" in capital letters to some of the charitable organizations on the list. When the viewer clicks on that organization's name, the word "ALERT" appears at the top of the page with an explanation. For example, on the page for the National Kidney Foundation of Middle Tennessee, Defendants state, "APPROVED BUT WITH CONCERN THAT 50% OF REVENUES GO TO FUND RAISING AND ADMINISTRATIVE COSTS, AND ONLY 50¢ OF EVERY $1 RAISED GOES TOWARD ORGANIZATION MISSION." When asked at oral argument

---

**3.** The procedure described in this paragraph is also used when the Board revokes a permit.

what authorizes this activity by the Board, Defendants' counsel simply pointed out that nothing prohibits it.

Defendants' web site also includes an "organizational page" for each permit holder. On an organizational page, Defendants list the permit holder's total revenues, fundraising costs, administrative and overhead costs, and net proceeds for the most recent fiscal year. The organizational page also includes a variety of additional information including the charitable organization's fundraising goals, anticipated financial data for the current fiscal year, fundraising methods, "controls in place" (e.g. checks over $200 require the signature of two persons, yearly audit, monthly financial reports to the board of directors), and fees or expenses paid to board members.

## C. THE DISPUTE BETWEEN PLAINTIFF AND THE BOARD

Plaintiff has regularly solicited donations throughout Tennessee since 1987 via local and national television and via direct mail. Believing that the Charitable Solicitations Ordinance covered only in-person fundraising activities, Plaintiff did not seek a permit from Defendants until late 1996, when it decided to begin in-person solicitations in Davidson County. Plaintiff obtained a permit in 1996 and renewed it without incident in 1997, 1998, and 1999.

In July 2000, Plaintiff conducted an external audit and investigation of its finance department. During the investigation, Plaintiff discovered that its Chief Financial Officer had forged external auditor reports for 1998 and 1999. Plaintiff immediately fired the Chief Financial Officer and notified all appropriate regulatory agencies. The Board was among the governmental agencies so notified because Plaintiff had submitted copies of the forged auditor reports to the Board in support of its applications for charitable solicitations permits

in 1998 and 1999. The Board's notification came in a letter dated October 25, 2000, from Larri Sue Jones, Plaintiff's Vice President and General Counsel.

On November 10, 2000, the Board received Plaintiff's application and fee to renew its charitable solicitations permit. The Board considered the application at its next meeting, on November 16, 2000. However, the Board deferred a decision until its February 2001 meeting because corrected financial statements for 1993 and 1999 were not yet available and because the Board wanted Plaintiff to produce a representative to answer questions regarding whether Plaintiff had implemented new procedures to prevent a recurrence of the irregularities in Plaintiff's auditor reports. It is not clear from the record why the Board did not hold a meeting in either December 2000 or January 2001.

Unfortunately for Plaintiff, its permit expired on November 16, 2000, and the Board did not issue a temporary permit for the time between its November 2000 and February 2001 meetings. Consequently, Plaintiff refrained from conducting in-person fundraising activities in Davidson County during this time period. In telephone conversations between representatives of the parties, however, Defendants demanded that Plaintiff also stop all direct mail and television broadcasts into Davidson County. Plaintiff did not acquiesce to these demands and continued to solicit donations in Davidson County through direct mail, television, and its web site. Plaintiff's television campaign during this time period included advertisements on the Fox Family Channel, WGN, and WKRN, the Nashville affiliate of ABC.

The Board's next meeting took place on February 22, 2001. By then, the 1998 and 1999 financial reports had been corrected, and Plaintiff had forwarded copies to the Board. The 2000 audit, which was sup-

posed to have been filed with the Board by December 31, 2000, was still not available. Per the Board's request, Larri Sue Jones appeared at the meeting accompanied by one of Plaintiff's external auditors. Defendants allege that Ms. Jones conceded at the meeting that Plaintiff had continued to solicit donations within Davidson County during the period that Plaintiff was without a permit. Nonetheless, the Board granted Plaintiff's application for a renewal permit at the conclusion of the meeting.

Defendants then began an investigation into whether Plaintiff had violated the Charitable Solicitations Ordinance by soliciting contributions in Davidson County without a permit during the time that Plaintiff's application was pending. At its meeting of April 26, 2001, the Board adopted a resolution requesting that Plaintiff provide various documentary evidence relevant to this allegation. Plaintiff, acting through counsel, refused. Then, at its regular meeting of June 28, 2001, the Board adopted a motion ordering Plaintiff to submit the following information to the Board within fifteen days of receipt of the order: (1) the "[n]umber and dates of any and all solicitations mailed to residents of all zip codes within Metropolitan Nashville/Davidson County ... from November 16, 2000 through February 22, 2001;" (2) the "[n]umber and dates of all broadcasted appeals aired on WKRN, Channel 2, to residents of Metropolitan Nashville/Davidson County ... from November 16, 2000 through February 22, 2001;" (3) a "[c]opy of the contract between Feed the Children, Inc., and WKRN, Channel 2, in effect from November 16, 2000 through February 22, 2001." Plaintiff again refused.

At its meeting of August 30, 2001, the Board adopted a resolution requesting the Metropolitan Department of Law to apply for a court injunction requiring Plaintiff to comply with the orders of the Board. Defendants then filed suit against Plaintiff in the Chancery Court of Davidson County seeking a permanent injunction requiring Plaintiff to submit the information ordered at the Board's meeting of June 28, 2001. According to Defendants' counsel at oral argument, the Chancery Court has since dismissed the case for lack of jurisdiction, and Defendants intend to refile in another state court. Thus, no state court action regarding this matter is pending at this time.

### III.

Preliminary injunctions are available pursuant to Rule 65 of the Federal Rules of Civil Procedure. The United States Court of Appeals for the Sixth Circuit has recognized four factors district courts must consider in determining whether to issue a preliminary injunction:

A.) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim;

B.) whether the party seeking the injunction will suffer irreparable harm without the grant of the extraordinary relief;

C.) the probability that granting the injunction will cause substantial harm to others; and

D.) whether the public interest is advanced by the issuance of the injunction.

*Dayton Area Visually Impaired Persons, Inc. v. Fisher,* 70 F.3d 1474, 1480 (6th Cir.1995); *see also Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson County, Tenn.,* 274 F.3d 377, 400 (6th Cir.2001). These factors are to be balanced and are "not prerequisites that must be met." *Fisher,* 70 F.3d at 1480 (quotation omitted).

The Sixth Circuit has also explained that, in the First Amendment context, the balance of the four factors is somewhat unusual in that the likelihood of success on the merits is usually the dispositive factor:

In First Amendment cases, the first factor will often be determinative. *See Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir.1998). This is because the Supreme Court has recognized that even minimal infringement upon First Amendment values constitutes irreparable injury. *See Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir.1989). Additionally, if the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere in its enjoinment. *See Connection Distrib.*, 154 F.3d at 288. Moreover, "it is always in the public interest to prevent violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich. Liquor Control Com'n*, 23 F.3d 1071, 1079 (6th Cir.1994).

*Deja Vu*, 274 F.3d at 400 (full citations substituted for short citations); *see also Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 888 (6th Cir.2000); *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir.1998). Thus, in *Deja Vu*, the Sixth Circuit focused its attention exclusively on the first factor, *see* 274 F.3d at 400. This Court finds that this first factor should be the primary consideration in this case as well.

## A. LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiff launches a facial attack on the Charitable Solicitations Ordinance, contending that it is likely to succeed on the merits because the Charitable Solicitations Ordinance (1) violates the First Amendment, (2) violates the dormant Commerce Clause, and (3) is otherwise preempted by federal law. Defendants conceded at oral argument that the Charitable Solicitations

Ordinance violates the dormant Commerce Clause insofar as it attempts to regulate cable television; however, Defendants dispute Plaintiff's contention that the Charitable Solicitations Ordinance is invalid with respect to all other forms of solicitation.

Courts are generally to avoid deciding constitutional issues, instead opting to resolve a motion on nonconstitutional grounds whenever possible. *See Clinton v. Jones*, 520 U.S. 681, 690 & n. 11, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997). This well established maxim of judicial restraint counsels in favor of the Court addressing Plaintiff's preemption argument before reaching the First Amendment and dormant Commerce Clause contentions.[4] However, Plaintiff seeks an injunction prohibiting Defendants from enforcing the Charitable Solicitations Ordinance against Plaintiff at all, while Plaintiff's preemption argument concerns only Defendants' attempt to regulate cable television, (Mem. Law Supp. Pl.'s Mot. Prelim. Inj., Docket Entry No. 12, at 18–19). Thus, even if the Court were to find Plaintiff's preemption argument persuasive, it would still be necessary to address a constitutional issue. Since adjudication of a constitutional issue is unavoidable, the Court chooses to address the First Amendment issue first, and finding it dispositive, does not reach Plaintiff's arguments regarding the dormant Commerce Clause and preemption.

## 1. THE CHARITABLE SOLICITATIONS ORDINANCE IS A PRIOR RESTRAINT ON SPEECH

■ Although the parties do not appear to dispute the point, it is important to note for context that the Charitable Solicitations Ordinance's licensing scheme

---

**4.** Preemption is treated as a nonconstitutional issue. *See Douglas v. Seacoast Prods., Inc.*, 431 U.S. 265, 272, 97 S.Ct. 1740, 52 L.Ed.2d 304 (1977) (although preemption "is basically constitutional in nature, deriving its force

from the operation of the Supremacy Clause, Art. VI, cl.2, it is treated as 'statutory' for purposes of our practice of deciding statutory claims first to avoid unnecessary constitutional adjudications.").

is a prior restraint on speech. "A 'prior restraint' exists when the exercise of a First Amendment right depends on the prior approval of public officials." *Deja Vu*, 274 F.3d at 400 (citing cases). "The term 'prior restraint' describes administrative and judicial orders that block expressive activity before it can occur." *Polaris Amphitheater Concerts, Inc. v. City of Westerville*, 267 F.3d 503, 506 (6th Cir.2001) (citing *Alexander v. United States*, 509 U.S. 544, 550, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993)). "Under a system of prior restraint, the lawfulness of speech turns on the advance approval of government officials." *Id.* (citing *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969)). "Although prior restraints 'are not unconstitutional per se,' they come to court bearing a heavy presumption against their validity." *Nightclubs*, 202 F.3d at 889 (quoting *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975)); *see also Deja Vu*, 274 F.3d at 400 (quoting *Freedman v. Maryland*, 380 U.S. 51, 57, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965)). "[L]aws that impose a prior restraint on free speech have been disfavored by the courts as tantamount to censorship and thought control." *Polaris Amphitheater Concerts*, 267 F.3d at 506. In light of the presumptive invalidity of prior restraints, it is unsurprising that the Supreme Court has already struck down a law that required professional charitable solicitors to obtain a permit. *See Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 795, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988).

2. WHETHER THE CHARITABLE SOLICITATIONS ORDINANCE IS A CONTENT–NEUTRAL OR CONTENT–BASED SPEECH REGULATION

■ The parties dispute whether the Charitable Solicitations Ordinance is a content-neutral or content-based prior restraint. At stake is the effect on this case of the Supreme Court's very recent decision in *Thomas v. Chicago Park District*, 534 U.S. 316, 122 S.Ct. 775, 151 L.Ed.2d 783, 2002 WL 46757 (2002). In *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), the Supreme Court held that a licensing scheme must contain certain procedural safeguards in order to avoid constituting an invalid prior restraint. *See* 380 U.S. 51, 58–59, 85 S.Ct. 734, 13 L.Ed.2d 649. These safeguards include the following:

(1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court.

*Thomas*, 534 U.S. at 321, 122 S.Ct. at 778 (quoting *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (principal opinion)); *see also Freedman*, 380 U.S. at 58–59, 85 S.Ct. 734. The Supreme Court subsequently applied the *Freedman* holding in *Riley*, striking down a charitable solicitations licensing scheme because the statute did not "provide that the licensor 'will, within a specified brief period, either issue a license or go to court.'" *Riley*, 487 U.S. at 802, 108 S.Ct. 2667 (quoting *Freedman*, 380 U.S. at 59, 85 S.Ct. 734).

However, the holding of *Thomas* is that the *Freedman* requirements apply only to content-based, not content-neutral, licensing schemes. *See* 534 U.S. at 321–22, 122 S.Ct. at 778–79. In light of the Supreme Court's admonition that lower courts are not to conclude that the Supreme Court has overruled a prior holding by implication, *see, e.g., Agostini v. Felton*, 521 U.S.

203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997), it appears to this Court that the only way to reconcile *Riley* with *Thomas* is to infer that the Supreme Court considers charitable solicitations licensing schemes like the one in *Riley* to be content-based and thus subject to the *Freedman* requirements. Even that, however, requires this Court to attribute to the Supreme Court a holding that it has not explicitly made.

In the case at bar, there can be little doubt that the Charitable Solicitations Ordinance fails to comply with the procedural requirements of *Freedman.* The ordinance contains no specified time in which the Board must act on a permit application, and the status quo is not maintained while an application is pending because the applicant is prohibited from soliciting during that time, *cf. Nightclubs,* 202 F.3d at 891 (ordinance fails to preserve status quo because if the city chooses not to renew a sexually oriented business license, that business must cease operation immediately). Those two deficiencies alone would, if the ordinance is content-based, compel this Court to hold it unconstitutional on the basis of *Riley* because, just as the statute at issue in *Riley* failed to do, the Charitable Solicitations Ordinance does not "provide that the licensor 'will, within a specified brief period, either issue a license or go to court.'" *Riley,* 487 U.S. at 802, 108 S.Ct. 2667 (quoting *Freedman,* 380 U.S. at 59, 85 S.Ct. 734).

In addition, expeditious judicial review is not available because judicial review may happen only by writ of certiorari, which is insufficient under Sixth Circuit law. *See Deja Vu,* 274 F.3d at 401. Moreover, the Charitable Solicitations Ordinance requires the aggrieved applicant, instead of the censor, to seek judicial review. Finally, it is the applicant, not the Board, who bears the burden of proof in court. For all of these reasons, if *Freedman* is applicable to this case, the Charitable Solicitations Ordinance is unconstitutional.

Perhaps because the significance of the "content-neutral" or "content-based" distinction was not entirely apparent until the Supreme Court issued the *Thomas* decision only two days before oral argument in this case, the parties have not thoroughly briefed the issue of whether the Charitable Solicitations Ordinance is content-neutral or content-based. Given the current state of the record at this early stage of the proceedings and the unresolved tension between *Riley* and *Thomas,* the Court is reluctant to rule either that the Charitable Solicitations Ordinance is a content-neutral or content-based speech regulation. However, for the reasons that follow, even if the ordinance is content-neutral, the Court is of the view that Defendants would still be likely to succeed on the merits. Therefore, the Court will assume, without deciding, that the Charitable Solicitations Ordinance is a content-neutral speech regulation and that the *Freedman* requirements, including the one applied in *Riley* that the licensor "will, within a specified brief period, either issue a license or go to court," do not apply.

3. WHETHER THE CHARITABLE SOLICITATIONS ORDINANCE MEETS THE CONSTITUTIONAL REQUIREMENTS FOR A CONTENT–NEUTRAL PRIOR RESTRAINT ON SPEECH

a. WHETHER THE CHARITABLE SOLICITATIONS ORDINANCE GRANTS THE BOARD TOO MUCH DISCRETION

"Of course even content-neutral time, place, and manner restrictions can be applied in such a manner as to stifle free expression." *Thomas,* 534 U.S. at 323, 122 S.Ct. at 780. For example, when a licensing official enjoys "unbridled discretion" in

determining whether to grant or deny a permit, the licensing scheme is unconstitutional even if it is content-neutral. *See Forsyth County, Georgia v. Nationalist Movement,* 505 U.S. 123, 130–31, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). The Supreme Court has "thus required that a time, place, and manner regulation contain adequate standards to guide the official's decision and render it subject to effective judicial review." *Thomas,* 534 U.S. at 323, 122 S.Ct. at 780 (citing *Niemotko v. Maryland,* 340 U.S. 268, 271, 71 S.Ct. 328, 95 L.Ed. 280 (1951)). Plaintiff contends that the Charitable Solicitations Ordinance grants the Board overly broad discretion, and the Court agrees that Plaintiff is likely to succeed in that argument.

The grant of discretion of greatest concern to this Court is the Charitable Solicitation Ordinance's requirement that the Board consider the "character and reputation for honesty and integrity of the applicant" in determining whether to grant or deny a permit. While benign at first blush, the requirement that the Board consider whether each applicant has sufficient "character" and "integrity" to be permitted to solicit donations in Davidson County is an invitation for the Board to consider whether it agrees with the applicant's views. Indeed, every applicant is required to inform the Board of the purpose for its solicitation and how the money will be spent, as if there were some purposes and expenditures that the Board would not allow. Defendants' counsel assured the Court at oral argument that the Board would of course grant a permit even to unpopular groups such as the Osama bin Laden Defense Fund or the Ku Klux Klan,

but if the Board is truly to consider an applicant's "character" and "integrity," it is unclear how such an assurance can be taken seriously.

Of almost equal concern is the Charitable Solicitation Ordinance's suggestion that the Board will "determine the kind and character of the proposed solicitation, and whether such solicitation is in the interest of, and not inimical to, the public welfare." Metro. Code § 6.64.110(A)(17). In fairness, this language does not appear in the list of five factors that the Board is to consider in determining whether to grant or deny a permit; rather, it appears in the section of the ordinance concerning the information an applicant must submit to the Board. Nonetheless, it is indicative of a sweeping discretion that, if the Board so desired, would enable it to deny a solicitations permit to an opposition political party because, in the Board's genuinely held opinion, such solicitation is not in the interest of the "public welfare." [5]

Plaintiff points to other grants of discretion in the Charitable Solicitations Ordinance. For example, the Board has the discretion to require an applicant to appear before the Board in person, *see* Metro. Code §§ 6.64.110(21), 6.64.120(B), and to submit financial information in addition to what is required in the ordinance, *see* Metro. Code § 6.64.110(A)(11)(b)(i). The Board also has the discretion to conduct an extensive investigation of an applicant, a modest investigation, or no investigation at all. *See* Metro. Code § 6.64.120(A). The Board has the discretion to inspect "all of the applicant's books, records and papers ...." *Id.* In fact, since the Board does not

---

**5.** The Court wishes to emphasize that there is no evidence in the record that the Board has ever actually done anything of the sort. Indeed, the fact that the Board granted 1,657 permits out of 1,661 applications over the last five years strongly suggests that the Board is, in practice, circumspect in exercising its power. However, since Plaintiff has mounted a facial attack on the Charitable Solicitations Ordinance itself, the issue is the scope of the Board's authority under the ordinance and not how the Board has exercised that authority in practice.

make written findings of fact "upon any application" as the ordinance requires, *see* Metro. Code § 6.64.130(B), the Board has even exercised discretion in disregarding something that the plain text of the Charitable Solicitations Ordinance requires. Although, in the Court's view, these grants of discretion are not as troubling as the discretion afforded the Board in its decision to grant or deny a permit, they do allow the Board opportunities to make the application process more cumbersome, time-consuming, and costly for those applicants unfortunate enough to find themselves in the Board's disfavor.

The Charitable Solicitations Ordinance may also be unconstitutional as much for what it does not say as for what it does say. Even if the provisions that the Court has described as likely granting an overly broad discretion of authority were excised, the ordinance must still "contain adequate standards to guide the official's decision and render it subject to effective judicial review." *Thomas*, 534 U.S. at 323, 122 S.Ct. at 780. The Charitable Solicitations Ordinance, however, neither requires the Board to issue a permit if certain prerequisites are met, nor does it mandate denial of a permit if certain circumstances are present. The ordinance merely lists five factors (one of them being the aforementioned "character" and "integrity" factor) for the Board to "consider." How the Board weighs the factors appears to be entirely within the Board's discretion. In addition, the Board appears free to consider unlisted factors, and what those factors are in any given case appear to be, again, entirely up to the Board.[6] For all of these

reasons, the Court finds that Plaintiff is likely to succeed in its argument that the Charitable Solicitations Ordinance vests overly broad discretion in the Board.

b. WHETHER THE CHARITABLE SOLICITATIONS ORDINANCE SURVIVES INTERMEDIATE SCRUTINY

 Regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (citing *Clark v. Cmty. for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)); *see also Connection Distrib.*, 154 F.3d at 291. In other words, content-neutral regulations "must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication." *Thomas*, 534 U.S. at 323 n. 3, 122 S.Ct. at 780 n. 3 (quoting *Forsyth*, 505 U.S. at 130, 112 S.Ct. 2395); *see also Clark*, 468 U.S. at 293, 104 S.Ct. 3065 (citing cases). "Narrow tailoring in this context requires, in other words, that the means chosen do not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Turner Broad.*, 512 U.S. at 662, 114 S.Ct. 2445 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)). However, "when a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of

---

**6.** It is partly for this reason that the Court, at this time, declines Defendants' invitation to "sever" any unconstitutional provisions of the Charitable Solicitations Ordinance and leave the rest of the ordinance intact. The Metropolitan Code contains a severability clause that states that it is the Metropolitan Council's intent that if any part of the Code is unconsti-

tutional, "the remaining words, clauses, sentences, paragraphs and sections" of the code shall remain in effect." *See* Metro. Code § 1.04.060. In addition, the Court believes that a preliminary injunction will sufficiently preserve the status quo without resolution of the severability issue.

serving the statutory goal." *Hill v. Colorado*, 530 U.S. 703, 726, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (citing *Ward*, 491 U.S. at 798, 109 S.Ct. 2746).

Defendants posit the prevention of fraud as the primary significant governmental interest that the Charitable Solicitations Ordinance serves. Defendants also contend that the ordinance serves the significant governmental interest of providing information to residents of Davidson County to assist them in making better informed choices about their charitable contributions. The Supreme Court has already held that a municipality has a significant governmental interest in protecting its residents from fraudulent charitable solicitations and may undertake efforts to promote the disclosure of such organizations' finances. *See Riley*, 487 U.S. at 795, 108 S.Ct. 2667; *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 637–38, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980). Furthermore, Plaintiff does not dispute that these are in fact the purposes of the Charitable Solicitations Ordinance. Nonetheless, Plaintiff maintains that these interests are not significant because the State of Tennessee already regulates charitable solicitations. Plaintiff offers no support for the proposition that the prevention of fraud and the provision of information cannot be significant governmental interests to both state and local governments simultaneously. In fact, state law allows a municipality to enact a more "stringent" regulation of charitable solicitations. *See* Tenn.Code Ann. §§ 48–101–518(a)–(f) (2000). The Court therefore finds that the Charitable Solicitations Ordinance serves significant governmental interests by attempting to prevent fraud and provide reliable information.

The Charitable Solicitations Ordinance, however, does not appear to allow "ample alternatives for communication." Indeed, in the absence of a permit, the ordinance shuts down *all* means of solicitation in Davidson County. The ordinance is unlike the ordinance at issue in *Thomas*, where applicants had to obtain a permit to use a park for a gathering of fifty or more persons. In *Thomas*, unlike in the case at bar, an unsuccessful applicant could use any location other than the park and could use whatever method of communication it wanted. In this case, an unsuccessful applicant may not solicit at *any* location in Davidson County by *any* means.

The Charitable Solicitations Ordinance also does not appear to be narrowly tailored. First, the statute affects everyone who wishes to solicit contributions in Davidson County, not just those who are making fraudulent solicitations. By subjecting all charitable organizations to the rigorous application procedure with the attendant discretion the Board has in whether to grant or deny a permit, the ordinance affects substantially more speech than is necessary to achieve its interest in preventing fraud. Second, while it is possible that denying permits to applicants who have low "character" and "integrity," who have lied on their application form, or who have engaged in fraudulent activity in the past may reduce the incidence of fraud, Defendants have provided no explanation for why laws prohibiting fraud are insufficient to achieve the same goal. *Cf. Riley*, 487 U.S. at 795, 800, 108 S.Ct. 2667 (holding that a law aimed at preventing fraud by requiring professional fundraisers to disclose the percentage of charitable contributions collected during the previous year that were actually turned over to charity is not narrowly tailored partly because a state "may vigorously enforce its antifraud laws to prohibit professional fundraisers from obtaining money on false pretenses or by making false statements"); *Vill. of Schaumburg*, 444 U.S. at 637–38, 100 S.Ct. 826 (holding that a local ordinance enacted to prevent fraud by prohib-

iting solicitations by charities not using at least 75% of its receipts for charitable purposes is not narrowly tailored partly because the municipality could simply outlaw fraudulent misrepresentations and punish such activity directly). Third, although the plethora of information that an applicant must provide to the Board certainly facilitates the goal of providing information to the public, that same information could be provided without requiring solicitors to obtain a permit. For all of these reasons, the Court concludes that Plaintiff has successfully shown that is likely to succeed in its facial attack on the Charitable Solicitations Ordinance by showing that it violates the First Amendment.

## B. IRREPARABLE HARM

 The Court further finds that Plaintiff is likely to suffer irreparable harm in the absence of an injunction. Any infringement of First Amendment rights causes irreparable harm. *See United Food & Commercial Workers Union v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 363 (6th Cir.1998); *Dayton Area*, 70 F.3d at 1489–90. Furthermore, Defendants' investigation could cause Plaintiff reputational harm, and Defendants' investigation and licensing scheme hinder Plaintiff's solicitation efforts in Davidson County.

## C. HARM TO OTHERS

Conversely, the Court believes that issuance of an injunction will cause little harm to others. Plaintiff will remain subject to state and federal laws that prohibit fraud and regulate charitable organizations, and the citizens of Davidson County will remain protected from unscrupulous fundraising tactics.

## D. PUBLIC INTEREST

Finally, the Court finds that a preliminary injunction will serve the public interest. Aside from it always being in the public interest to prevent a violation of constitutional rights, *see Deja Vu,* 274 F.3d at 400, it is generally in the public interest for charities to be able to raise money without undue interference from government.

## IV.

Based on the foregoing reasons, Plaintiff's Motion for a Preliminary Injunction (Docket Entry No. 32) will be GRANTED. Defendants will be enjoined from taking any action to enforce the provisions of the Charitable Solicitations Ordinance, Metropolitan Code §§ 6.64.070–6.64.230, against Plaintiff pending the outcome of this lawsuit.