Filed: August 16, 2002

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

Nos. 98-2583(L)
(CA-98-9-L)

John Daniel Reyes,

Plaintiff - Appellant,

versus

City of Lynchburg,

Defendant - Appellee.

O R D E R

The court amends its opinion filed August 6, 2002, as follows:

On page 2, section 5, lines 3 and 6 -- the firm name of "ALEXANDER BELL, P.L.C.," is added after attorneys Alexander Wayne Bell and Mary V. Barney.

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

JOHN DANIEL REYES,
    *Plaintiff-Appellant,*

    and

KEITH TUCCI,
    *Plaintiff,*

    v.

CITY OF LYNCHBURG,              No. 98-2583
    *Defendant-Appellee,*

    and

WILLIAM G. PETTY, in his official
capacity as Commonwealth
Attorney for the City of Lynchburg,
Virginia,
    *Defendant.*


JOHN DANIEL REYES; KEITH TUCCI,
    *Plaintiffs-Appellees,*

    v.

CITY OF LYNCHBURG,
    *Defendant-Appellant,*    No. 98-2690
    and

WILLIAM G. PETTY, in his official
capacity as Commonwealth
Attorney for the City of Lynchburg,
Virginia,
    *Defendant.*

Appeals from the United States District Court

for the Western District of Virginia, at Lynchburg.

Norman K. Moon, District Judge.

(CA-98-9-L)

Argued: December 2, 1999

Decided: August 6, 2002

Before WIDENER and MICHAEL, Circuit Judges, and

HAMILTON, Senior Circuit Judge.

_____

Affirmed by published opinion. Judge Widener wrote the majority opinion, in which Senior Judge Hamilton concurred. Judge Michael wrote a dissenting opinion.

_____

## COUNSEL

**ARGUED:** Stephen Melvin Crampton, AMERICAN FAMILY ASSOCIATION LAW CENTER, Tupelo, Mississippi, for Appellant. Alexander Wayne Bell, ALEXANDER BELL, P.L.C., Lynchburg, Virginia, for Appellee. **ON BRIEF:** Brian Fahling, Michael J. DePrimo, AMERICAN FAMILY ASSOCIATION LAW CENTER, Tupelo, Mississippi, for Appellant. Mary V. Barney, ALEXANDER BELL, P.L.C., Lynchburg, Virginia, for Appellee.

_____

## OPINION

WIDENER, Circuit Judge:

Plaintiff John D. Reyes appeals the district court's grant of summary judgment to the City of Lynchburg ("the City") on Reyes's 42 U.S.C. § 1983 claim. Reyes sought nominal damages under § 1983, an injunction against future enforcement of the City's parade ordinance, and a declaration that the City's parade ordinance was unconstitutional on its face and as applied to him. The district court found

2

the City's parade ordinance defective because it did not provide one adequate procedural safeguard; however, the court held that Reyes could not sustain a valid claim under § 1983 because the City did not violate Reyes's constitutionally protected interests. We affirm the grant of summary judgment to the City.[1]

I.

On November 10, 1997, Reyes, along with other protesters, held an anti-abortion protest on and around the grounds of a public high school in Lynchburg, Virginia. None of the protesters had applied for or received a parade permit under the City's parade ordinance. A grand jury indicted Reyes for violating the ordinance, trespassing on school property and engaging in disorderly conduct. Reyes was found guilty of trespass only in the Circuit Court of the City of Lynchburg.[2]

The parade ordinance provided that "[i]t shall be unlawful for any person to conduct or participate in a parade . . . on the public streets, sidewalks . . . for which a written permit has not been issued in accordance with the provisions of this article." Lynchburg, Va., Code art. X, § 25-374.1 (repealed March 10, 1998). On February 27, 1998, Reyes and Keith Tucci filed a complaint in the district court pursuant to § 1983 challenging the constitutionality of the parade ordinance on its face and as applied to Reyes and seeking declaratory relief and an injunction prohibiting the City from enforcing the parade ordinance in the future. Reyes and Tucci also alleged that they planned another protest but feared arrest, criminal and/or civil prosecution and penalties under the parade ordinance and were thereby "deterred and chilled in the exercise of their fundamental constitutional rights." For damages, Reyes claimed: "Award to John Reyes nominal damages . . . ." A.18. On June 24, 1998, the district court found that because the City repealed the parade ordinance on March 10, 1998, the action for declaratory relief was moot.[3] The court dismissed Tucci as a party

_____

[1] The judgment being affirmed, the City's cross-appeal is dismissed as moot.

[2] Reyes challenged the constitutionality of the parade ordinance before the circuit court, which did not address the issue.

[3] Tucci announced his intention to protest at the public high school on March 13, 1998. Lynchburg's City Attorney told Tucci and Reyes that

3

to the action, but denied the City's motion to dismiss as to Reyes, reasoning that Reyes's § 1983 claim for nominal damages created a live controversy. Tucci is not a party to this appeal.

The parties filed cross-motions for summary judgment. After a hearing, the district court granted the City's motion. Due to the court's prior ruling that the case was moot as to future conduct, the court found that a facial challenge to the parade ordinance was moot as well. The court entertained Reyes's claim that the parade ordinance was unconstitutional as applied to him and found that the parade ordinance was defective.[4] Despite this finding, the court held that the City did not violate Reyes's First Amendment rights or his Fourteenth Amendment due process rights and granted summary judgment to the City.

We review *de novo* the district court's grant of summary judgment to the City, viewing the evidence in the light most favorable to the nonmoving party. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Although we affirm the district court's decision to grant summary judgment to the City, we do so on different reasoning than relied upon by the district court. *Securities & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 88 (1943).

## II.

Reyes asserts the following issues in this appeal: 1) the City's parade ordinance is facially unconstitutional because it lacks adequate procedural safeguards and is overbroad, 2) the parade ordinance is unconstitutional as applied to him, and 3) the court erred in relying upon affidavits of City officials. The City cross appeals the court's

_____

the City and the Commonwealth's Attorney would not enforce the ordinance until the City Council reviewed it. Thereafter, the City repealed the ordinance altogether. Additionally, the City reassured Reyes and Tucci that it had no intention of reenacting the parade ordinance.

[4] The court found that the parade ordinance did not provide a specific time frame for the decisionmaker to consider parade permit applications.

4

finding that the parade permit was procedurally defective and asks this court either to affirm the district court's grant of summary judgment to the City or to dismiss the case as moot.

We first address whether the district court properly refused to examine Reyes's overbreadth challenge to the parade ordinance upon determining that the challenge was moot. On June 24, 1998, the court ruled that the case was moot as to future application of the parade ordinance because the City had repealed it and promised not to reenact a similar one. We agree with the district court that the repealed parade ordinance cannot now, if it ever did, reach any amount of constitutionally protected conduct.[5] The question of overbreadth does not present a live case or controversy for this court. There is no reasonable expectation that Lynchburg will reenact the ordinance. See *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997), see also *Telco Communications, Inc. v. Carbaugh*, 885 F.2d 1225, 1231 (4th Cir. 1989).

We next address Reyes's other assertions about the repealed parade ordinance and the grounds for his § 1983 action. As an initial matter, we note that Reyes sought nominal damages from the City under § 1983. Nominal damages may be available in a § 1983 case if a plaintiff was deprived of an absolute right yet did not suffer an actual injury. See *Carey v. Piphus*, 435 U.S. 247, 266 (1978) (holding that the right to procedural due process is absolute making the deprivation of the right actionable for nominal damages without proof of actual injury). Reyes claims the City violated his First Amendment right to free speech and his Fourteenth Amendment due process rights by applying the parade ordinance, which he asserts was unconstitutional, against him.[6] The district court considered Reyes's challenge to the

_____

[5] We also note that facial invalidation of a law for overbreadth is "strong medicine," *Broadrick v. Oklahoma*, 413 U.S. 601, 613-14 (1973), and is generally disfavored unless the law promotes a licensing scheme giving unbridled discretion to the decisionmaker. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 223 (1990) (plurality opinion) (O'Connor, J.) & 261 (Scalia, J., concurring in part and dissenting in part).

[6] Reyes must be considered to refer to his indictment and prosecution under the ordinance because he never attempted to apply for a permit as required under the ordinance.

5

parade ordinance as applied to Reyes and found it did not provide a specified time for the chief of police to act upon the application for a parade permit and found the ordinance defective because it did not provide adequate procedural safeguards. Without such safeguards, the court determined that the ordinance posed a danger of impermissibly restraining free speech rights.

The parade ordinance in question provided in pertinent part:

(a) The chief of police, or his designee, *shall issue* the permit if the proposed parade, assemblage or picketing will not endanger public health, welfare, or safety, applying the following criteria and finding that:

(1) the time, duration, route and size of the parade . . . will not unreasonably interrupt the safe and orderly movement of . . . traffic;

(2) the parade . . . is not of such a nature that it will require diversion of so great a number of police or fire personnel to properly police the line of movement in the areas contiguous thereto so as to impair the normal protection of the remainder of the [C]ity;

(3) the applicant has provided for the services of monitors sufficient to control the orderly conduct of the parade . . . in conformity with such permit;

(4) the conduct of the parade . . . will not unduly interfere with the proper fire and police protection of, or ambulance service to, the remainder of the [C]ity, or unreasonably disrupt other public services and protection normally provided to the [C]ity; and

(5) the parade . . . will not interfere with another parade . . . for which a permit has been granted.

6

(b)  If the chief of police, or his designee, disapproves the application, he shall mail to the applicant a notice of his action, stating the reasons for his denial of the permit.

(c)  Nothing in this article shall permit the chief of police, or his designee, to deny a permit based upon political, social, or religious grounds or reasons or based upon the content of the views expressed.

Lynchburg, Va., Code art. X, § 25-374.3 (repealed March 10, 1998) (emphasis added).

The other sections of the parade ordinance germane to the analysis are: any person desiring to conduct a parade must make an application to the chief of police 48 hours prior to the parade, § 25-374.2(a); the chief of police has the authority to consider applications filed less than 48 hours prior to the parade where the applicant shows good cause, § 25-374.2(c); and an applicant whose permit was disapproved may appeal to the City Manager within 48 hours, and the City Manager must act on the appeal within five working days after its receipt, § 25-374.7.

A city, such as Lynchburg, is justified in setting forth regulations and ordinances requiring advance parade permits as a traditional exercise of control by the local government. *Cox v. New Hampshire*, 312 U.S. 569, 574 (1941). These ordinances are generally treated as time, place, and manner restrictions and are upheld by courts if they are content neutral, serve a substantial governmental interest, and leave open alternative avenues of communication. See *FW/PBS, Inc.*, 493 U.S. at 245 (White, J., concurring in part and dissenting in part) (citations omitted). A court may invalidate a permit scheme if, despite being content neutral, the scheme vests unbridled discretion in the decision-maker. See *Shuttlesworth v. Birmingham*, 394 U.S. 147, 150-52 (1969) (striking down a content-based parade ordinance). The district court found that although the parade ordinance did not give the chief of police unbridled discretion, it did not contain all of the procedural safeguards required to constitute a permissible prior restraint. As noted, the court interpreted the ordinance as failing to provide a specific time frame in which the chief of police, or his designee, should consider the permit application and found that the lack of such

7

time frame violated the requirement set forth in *Freedman v. Maryland*, 380 U.S. 51, 58-60 (1965),[7] and *FW/PBS, Inc.* See also *11126 Baltimore Blvd. v. Prince George's County*, 58 F.3d 988, 996 (4th Cir.) (en banc), *cert. denied*, 516 U.S. 1010 (1995).

At this point we emphasize that there is no claim in this case of content discrimination in the issuance or non-issuance of parade permits. And we emphasize that the ordinance in question, as previously noted, provides that the chief of police may not "deny a permit based upon political, social, or religious grounds or reasons or based upon the contents of the views expressed." So the quite serious question which confronts the courts in many such cases does not exist here.

Also, no question is made in this case of any burden of proof required by the City to support the denial of a parade permit, the third *Freedman* requirement.

The district court held that the available Virginia procedures for judicial review of the denial of parade permits complied with the second *Freedman* requirement, that of available expeditious judicial review. While it is true that in Virginia, under Virginia Code § 15.2-1404, "[e]very locality may sue or be sued in its own name in relation to all matters connected with its duties," thus opening the door for litigation in such cases, it is of even more importance that the extraordinary remedy of mandamus is available in such cases as this, both in the circuit courts, which are courts of general jurisdiction, and also even in the Supreme Court of Virginia, as a court of original jurisdiction. See Virginia Code §§ 17.1-513 and 17.1-309. See also *Burk's Pleading and Practice* (1952) § 199. Mandamus by the highest court in a State is certainly a plain and efficient remedy, and probably speedy, for "[i]f no defense is made and the petition states a proper

_____

[7] The Supreme Court in *Freedman* identified three requirements necessary to ensure a prompt decision for permits or licenses for First Amendment activities: 1) any restraint prior to judicial review can be imposed only for a specified brief period during which status quo must be maintained; 2) expeditious judicial review of that decision must be available; and 3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court. *FW/PBS, Inc.*, 493 U.S. at 227 (citing *Freedman*, 380 U.S. at 58-60).

8

case for the writ, a peremptory writ is awarded with costs." *Burk's*, p. 325. That the Supreme Court of Virginia does not hesitate to award the writ in an original proceeding against a local official, even the Registrar of the South Wise Precinct in Wise County, is demonstrated in *Kennedy v. Skeen*, 186 S.E. 926 (Va. 1934).

Although it is likely that the Virginia courts would give relief in a prompt enough manner to satisfy the *Freedman* requirement, there has been no analysis in this case of any time requirements such as was made in *11126 Baltimore v. Prince George's County Maryland*. So we express no opinion on that question.

For the purposes of our analysis, we will assume, without deciding, to be correct the decision of the district court, that the ordinance in question does not sufficiently restrict the time in which the chief of police must grant or deny a parade permit; and for the purposes of our analysis, we will also assume, without deciding, that the *Freedman* requirement of prompt judicial review has not been complied with.

### III.

All of the above leads us to the position that the only question remaining in the case is whether or not Reyes, under § 1983, may prosecute a civil cause of action for nominal damages against the City for his indictment, trial and acquittal under the parade ordinance which was later held to be unconstitutional.[8] We hold that he may not.

_____

[8] Included in his §1983 claim, Reyes claims that his First Amendment right to free speech had been sufficiently chilled to constitute a violation. Under the facts of this case, we find no merit to this claim. Reyes was indicted under the assumed unconstitutional parade ordinance three weeks after the initial protest; he was not arrested, warned, or harassed on the scene. Ultimately, he was found not-guilty of violating the ordinance. After being found not-guilty, Reyes was informed on March 3, 1998 that the parade ordinance would not be enforced against him in the future. The ordinance was repealed on March 10, 1998. Reyes asserts that he planned to attend a March 13 anti-abortion protest, but feared prosecution, which chilled his speech. The protest occurred without incident. Under the facts, we find this claim without merit, the ordinance repealed on March 10th could not chill speech to occur on March 13th.

9

The position of Reyes is succinctly stated in his brief:

> The City enacted and maintained the Ordinance. It remained exclusively within the City's prerogative to amend or repeal the Ordinance, and the City chose neither until after Reyes had been indicted and criminally prosecuted under the Ordinance. Such inaction in the context of a facially unconstitutional Ordinance renders the City liable. Br.26.

We follow the case of *Richardson v. City of South Euclid*, 904 F.2d 1050 (6th Cir. 1990), *cert. denied*, 498 U.S. 1032 (1991), a case essentially on all fours with the case at hand. In that case, Ronnie and Diva Richardson, husband and wife, moved to South Euclid in May of 1986. In October, the City of South Euclid passed an ordinance which made it a misdemeanor to own, operate, or manage a brothel or to invite or entice another to engage in acts of lewdness or sexual conduct. In December, 1986, the Richardsons were charged with violating that ordinance, and on June 26, 1987, the charges against the Richardsons were dismissed when the Municipal Court of South Euclid found the ordinance to be vague, overbroad, and unconstitutional on its face under the First and Fourteenth Amendments. The decision of the Municipal Court was affirmed by the Ohio Court of Appeals and then by the Ohio Supreme Court in 1990.

The Richardsons, in the meantime, had filed a suit under 42 U.S.C. § 1983 in the district court against the City and certain City officials,

_____

Just as importantly, Reyes suffered no loss from the ordinance in question— he was found not guilty and was assured he would not be further prosecuted under the ordinance. It appears that Reyes's main contention is freedom from criminal prosecution. As noted in *Richardson v. City of South Euclid*, 904 F.2d 1050, 1054 (6th Cir. 1990), *cert. denied*, 498 U.S. 1032 (1991):

> Freedom from criminal prosecution, [absent bad faith, see *Dombrowski v. Phister*, 380 U.S. 479, 480 (1965),] is not an interest that is accorded constitutional protection. Where appropriate procedures are followed, the states recognize no interest to be free from the burdens of defending oneself against an unsuccessful prosecution, and neither does the Bill of Rights.

10

claiming to have suffered humiliation, emotional distress, physical harm, loss of earnings, and legal expenses as a result of their defense against the prosecution. They sought $250,000 in damages. The district court granted summary judgment to the City because it found no Constitutional deprivation sufficient to support the § 1983 suit. This holding was affirmed by the Sixth Circuit. That court stated the question as follows:

> We next examine whether the Richardsons, having been prosecuted under an unconstitutional ordinance, suffered a constitutional deprivation sufficient to support a claim under 42 U.S.C. § 1983 . . . .

The Richardsons claimed a loss of liberty interest as a result of being required to bear the burden of defending against a criminal prosecution brought under an invalid ordinance. 904 F.2d at 1052. The court, citing *Baker v. McCollan*, 443 U.S. 137 (1979), noted that even the three-day detention in *Baker* did not amount to a deprivation of liberty recognized under § 1983 since the police had complied with due process of law. Accordingly, *Richardson* held that the prosecution did not deprive the Richardsons of any liberty interest. "The Richardsons were not convicted without notice and trial. They were charged in writing, permitted an opportunity to respond in open court, and vindicated by the dismissal of all charges after the municipal court found the ordinance unconstitutional." 904 F.2d at 1053. The court held that, under those facts which are essentially the same as those in Reyes's case, they were not deprived of any liberty interest because the ordinance was later held to be unconstitutional. 904 F.2d at 1053. We agree.

The Richardsons also argued that prosecution under an ordinance subsequently deemed to be invalid automatically gives rise to a cause of action under § 1983. This argument is very much akin to the argument Reyes makes here and which we have quoted from his brief just above. The argument goes that apparently the unconstitutionality of the law itself should supply the Constitutional element underlying a valid claim under § 1983. 904 F.2d at 1054. The *Richardson* court held there was no automatic § 1983 claim on account of prosecution under the invalid ordinance. The court relied on *Carey v. Piphus*, 435 U.S. 247 (1978), for the proposition that a procedural deficiency in

11

due process may be actionable but that to prosecute such a claim "[t]he plaintiff [must] . . . convince the trier of fact that he actually suffered distress because of the denial of procedural due process itself." 435 U.S. at 263, 904 F.2d at 1055. The Richardson court found no denial of procedural due process, and none is even claimed here.

The court concluded that

> This [concern for the integrity of the judicial process] suggests to us that a per se cause of action for persons prosecuted under a law later to be determined unconstitutional should be rejected because it would place state law enforcement officials in the precarious position of having to determine whether a new law is valid and worthy of their enforcement before risking, through enforcement, suffering damages should the law later be deemed invalid. We think the fourteenth amendment does not contemplate that state of affairs.

904 F.2d at 1055.

We are unable to distinguish the case at hand from *Richardson*. Indeed, if anything, this case would seem to be stronger for the City of Lynchburg because only nominal damages are claimed, and Reyes was acquitted rather than convicted under the ordinance in question. We agree with *Richardson*.[9]

The judgment of the district court is accordingly
_____

[9] The intervening decision of the Court in *Thomas*, mentioned in the dissenting opinion, only strengthens our position. The necessity to argue overbreadth to obtain a supporting reason for the conclusion reached by the dissent illustrates perfectly the reasoning of the Sixth Circuit, which we have quoted, slip p. 12, that holdings such as that advocated by the dissent, amounting to an automatic cause of action, ". . . would place state law enforcement officials in the precarious position of having to determine whether a new law is valid and worthy of their enforcement before risking, through enforcement, suffering damages should the law later be deemed invalid."

12

*AFFIRMED.*[10]

MICHAEL, Circuit Judge, dissenting:

The majority, relying on *Richardson v. City of South Euclid*, 904 F.2d 1050 (6th Cir. 1990), concludes that Reyes's claim for nominal damages must fail because he suffered no constitutional injury from being indicted and prosecuted under the Lynchburg public assembly ordinance. I respectfully disagree. Reyes, unlike the plaintiffs in *Richardson*, has alleged a classic First Amendment injury by claiming that his indictment and prosecution under the ordinance chilled the exercise of his constitutional rights of free speech and assembly. Because the City has done nothing to cast doubt on the truth of this allegation, the district court erred when it determined on summary judgment that Reyes had not suffered any constitutional injury.

A.

As the majority explains, the plaintiffs in *Richardson* sought damages under 42 U.S.C. § 1983 to compensate them for their alleged humiliation, emotional distress, physical harm, loss of earnings, and legal expenses that resulted from defending against prosecution under an ordinance later found to be unconstitutional. The plaintiffs in *Richardson* did *not* allege that their speech or conduct had been chilled or

---

[10] While this appeal was pending in this court, Reyes moved to file with the court certain supplemental materials in response to the City's brief which are: Six pages out of apparently 113 pages of a deposition of one William E. McRorie; a letter from the circuit judge of the circuit court of the City of Lynchburg in response, and in apparent answer to Reyes's adherents, to Reyes's motion to reduce or modify his sentence; a copy of a newspaper article dated November 18, 1997 with respect to the demonstration which is the subject of this case; and one page out of a deposition of apparently 52 pages of a certain Colonel Charles W. Bennett, who is mentioned in the said newspaper article. Bennett is apparently a police official. The defendants deny that those papers are properly a part of the record in the case, and upon examination, we believe it more likely that they are not, in which event a peremptory denial of the motion would usually be in order. In an abundance of caution, however, we grant the motion and consider the papers, none of which, singly or together, have had any bearing on our decision in this case.

deterred as a result of the prosecution, a fact critical to the analysis in that case. Rather, as the Sixth Circuit put it, the question was whether a constitutional injury was present "where no deprivation other than that suffered as a result of maintaining a legal defense is sustained by the party prosecuted." *Id.* at 1051. Because the injury alleged in *Richardson* was solely that of defending against a prosecution — an injury of being required to engage in the criminal process — the court analyzed the claim under the Due Process Clause rather than the First Amendment. *Id.* at 1052-53. In its due process analysis, the court reasoned that "[t]he prosecution itself is the observance of process due the accused." *Id.* at 1053. More particularly, the plaintiffs in *Richardson* had received due process because they "were charged in writing, permitted an opportunity to respond in open court, and vindicated by the dismissal of all charges after the municipal court found the ordinance unconstitutional." *Id.*

This case is quite different. Unlike the plaintiffs in *Richardson*, Reyes alleges that because of his indictment and prosecution, "[t]he fear of criminal prosecution has caused [him] to be deterred and chilled in the exercise of [his] fundamental constitutional rights," including the First Amendment rights of free speech and peaceable assembly.[1] Thus, Reyes alleges that his speech was chilled during the period in which he was indicted and prosecuted under the ordinance prior to its repeal. The act of defending against a criminal prosecution under an unconstitutional ordinance may or may not constitute a First Amendment injury.[2] But being inhibited from speaking because of an

_____

[1] Reyes also alleges, like the plaintiffs in *Richardson*, that defending against the prosecution was itself a constitutional injury. However, because Reyes alleges other constitutional injuries, this is not a case "where no deprivation other than that suffered as a result of maintaining a legal defense is sustained by the party prosecuted." *Richardson*, 904 F.2d at 1051.

[2] Because Reyes adequately alleged constitutional injury in the form of chilled speech, this case does not require a decision on whether to adopt *Richardson*'s holding that defending against prosecution under an unconstitutional ordinance does not amount to constitutional injury. Incidentally, the *Richardson* holding prompted a vigorous dissent. *See Richardson*, 904 F.3d at 1055-58 (Merritt, C.J., dissenting). And it appears that not all courts follow the approach of the *Richardson* major-

14

ongoing prosecution is a classic First Amendment injury. *See Vernon Beigay, Inc. v. Traxler*, 790 F.2d 1088, 1091 (4th Cir. 1986) (assuming that police officers' actions had actually chilled plaintiff's speech, then plaintiff suffered a First Amendment injury in fact); *Pittman v. Cole*, 267 F.3d 1269, 1283 (11th Cir. 2001) (allegation that Alabama Judicial Inquiry Commission opinion caused "self-censorship" on the part of the plaintiffs, if true, constituted First Amendment injury in fact); *Sloman v. Tadlock*, 21 F.3d 1462, 1470 (9th Cir. 1994) (The jury "reasonably could have concluded that [plaintiff's] political activity was a substantial or motivating factor in [the police officer's] decisions to issue a citation and warnings to him, that the claimed reasons for the citation and warnings were groundless, and that such police conduct *chilled the political expression of [plaintiff] and his group*. This is an adequate predicate to support liability against [the officer] under § 1983.") (emphasis added). If Reyes can prove, as he has alleged, that his speech was chilled during the period after his indictment and before the ordinance was repealed, then he is entitled to nominal damages at the very least. *See Carey v. Piphus*, 435 U.S. 247 (1978).

The majority explains that because Reyes was not harassed or arrested at the scene of the original protest on November 10, 1997, he cannot claim that his speech at that event was chilled. *See ante* at 9-10 note 8. The majority also notes that the ordinance was repealed on March 10, 1998, and thus concludes that Reyes was not deterred from participating in a planned protest on March 13. *Id.* I agree with both of these observations. Reyes cannot claim that his speech was chilled before he was indicted on December 1, 1997, or after the ordinance was repealed on March 10, 1998. Yet this leaves a three-and-a-half-month window between December 1, 1997, and March 10, 1998. In Reyes's complaint, filed February 27, 1998, before the ordinance was repealed, he alleges that "[t]he fear of criminal prosecution has caused

_____

ity. *See, e.g.*, *Faustin v. City and County of Denver*, 268 F.3d 942, 947-48 (10th Cir. 2001) (First Amendment plaintiff "has standing to sue for damages based on her prosecution (including nominal damages, which she sought)" even though "the section 3-1 [bill posting] charge against Faustin was dismissed . . . and she is not being prosecuted under section 3-1 at this time.").

15

[him] to be deterred and chilled in the exercise" of his First Amendment rights of free speech and assembly. Clearly, Reyes is alleging not only that the fear of criminal prosecution *will deter* him from participating in the protest planned for March 13, 1998, but also that the pending criminal prosecution has *already* deterred and chilled him from speaking.

The majority concludes that "[u]nder the facts of this case, [it] find[s] no merit to" Reyes' claim that his exercise of his First Amendment rights was chilled. However, what little we know about the facts of this case, at least with regard to whether and when Reyes's speech was chilled, comes entirely from the allegations in Reyes's complaint. I concede that Reyes does not allege in detail how his speech was chilled during the three and a half months between his indictment and the repeal of the ordinance. Under our system of notice pleading, however, great specificity is not required: a complaint need only contain "a short and plain statement of the claim." Fed. R. Civ. P. 8(a). In response to Reyes's allegation that his speech *had been* chilled (as opposed to would be chilled in the future), the City of Lynchburg stated in its answer that "it is without knowledge or information sufficient to form a belief as to the truth" of this allegation. And in its motion for summary judgment, the City did not address, let alone contest, Reyes's allegation that he had already suffered a chill to his First Amendment rights as a result of the prosecution. It is of course true that "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal quotations omitted). Nevertheless, when a defendant has not contested an allegation with an affidavit or other evidentiary materials, a district court may not simply discount the allegation in deciding a motion for summary judgment. *See Elbe v. Yankton Indep. School Dist. No. 1*, 714 F.2d 848, 850 (8th Cir. 1983) (For summary judgment purposes, "[a]llegations in a complaint, which are not contested by the moving party by affidavit or other evidentiary materials, are assumed true."); *Galvan v. Bexar County, Tex.*, 785 F.2d 1298, 1302 (5th Cir. 1986).

The district court, like the majority, concluded that Reyes had failed to show that his First Amendment free speech rights were "sufficiently chilled to constitute a violation." But the district court

16

reached this conclusion on very different grounds than the majority. The district court acknowledged that "Reyes claims that the threat of future indictments for violating the City ordinance chilled his free speech." The court went on to say, however, that "the ordinance did not prohibit Reyes from standing on a sidewalk *by himself* to proclaim his anti-abortion message." The court also noted that "Reyes previously had protested in other areas of the City without so much as a warning from a police officer." These observations are insufficient to overcome Reyes's allegation that his constitutional rights had been chilled by the indictment and prosecution. The First Amendment, which provides for freedom of peaceable assembly as well as freedom of speech, protects Reyes's right to speak from the public sidewalk in the company of a friend just as clearly as it protects his right to stand there and speak all alone. *See NAACP v. Button*, 371 U.S. 415, 430 (1963) ("[T]here is no longer any doubt that the First and Fourteenth Amendments protect certain forms of orderly group activity."). Nor is it clear to me why the district court thought that the fact that Reyes had engaged in prior protests without arrest or prosecution undermined his claim that his speech was chilled. Because Reyes had been indicted and was facing criminal prosecution, a reasonable factfinder could certainly conclude that at least until March 10, 1998, when the ordinance was repealed, Reyes feared future punishment if he engaged in further protests. *See Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965) ("The chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure.").

In sum, apart from whether the majority is correct to adopt the holding in *Richardson*, summary judgment for the City was inappropriate because Reyes has adequately alleged a constitutional injury in the form of chilled speech. He claims that the indictment and prosecution for his public protest "has caused [him] to be deterred and chilled" in the exercise of his First Amendment rights. This allegation, framed in the past tense in a complaint filed February 27, 1998, can only be read to mean that Reyes's speech was chilled in the period after his indictment on December 1, 1997, and before the ordinance was repealed on March 10, 1998. The City of Lynchburg did nothing to confront or contest this allegation in the summary judgment proceedings. Accordingly, the district court erred when it granted summary judgment to the City on the ground that there was

17

no constitutional injury to support Reyes's claim for nominal damages.

### B.

The majority does not squarely rule on the constitutionality of the ordinance. It holds that even if the ordinance is unconstitutional, Reyes has suffered no constitutional injury. Because I believe that summary judgment was inappropriate on the issue of constitutional injury, I must deal with whether the ordinance is in fact unconstitutional. I conclude that the ordinance is unconstitutional on its face because it is overbroad: it is not narrowly tailored to serve the substantial government interests asserted.

The first job is to determine the appropriate constitutional standard for reviewing the ordinance. The parties agree that the Lynchburg ordinance must satisfy the requirements for a time, place, and manner regulation, namely, that the ordinance must be content-neutral, "must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication." *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). In addition, the ordinance must "contain adequate standards to guide the official's decision and render it subject to effective judicial review." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, ___, 122 S. Ct. 775, 780 (2002). The parties disagree, however, about whether the ordinance must also be analyzed to determine whether it is a prior restraint on speech subject to the procedural requirements set out in *Freedman v. Maryland*, 380 U.S. 51 (1965). The Supreme Court has recently resolved this question, explaining that a permit or licensing scheme that "is not subject-matter censorship but content-neutral time, place, and manner regulation of the use of a public forum" is not subject to "the procedural requirements set forth in *Freedman*." *Thomas*, 534 U.S. at ___, 122 S. Ct. at 779-80. Reyes does not contend that the ordinance is content based, and a review of the ordinance confirms that it is content neutral. The ordinance indicates that the chief of police or his designee shall issue the permit unless the proposed conduct would "endanger the public health, welfare or safety," as clarified by a list of specific concerns. Lynchburg, Va., Code art. X, § 25.374.3(a) (repealed March 10, 1998). As in *Thomas*, "[n]one of the grounds for denying a permit has anything to do with what a

18

speaker might say." *Thomas*, 534 U.S. at ___, 122 S. Ct. at 779. Thus, the Lynchburg ordinance is not subject to the procedural requirements of *Freedman*.

The *Freedman* requirements aside, Reyes claims that the ordinance is unconstitutional both as applied to his conduct and on its face due to overbreadth. Because I believe that the ordinance is overbroad on its face, I will not address Reyes's as applied challenge.[3] In the First Amendment context, "an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable." *Forsyth*, 505 U.S. at 129. A challenge that an ordinance is facially overbroad is permitted when, among other things, "the ordinance sweeps too broadly, penalizing a substantial amount of speech that is constitutionally protected." *Id.* at 130. The majority reasons that because the ordinance has been repealed, it no longer reaches *any* amount of constitutionally protected conduct. Accordingly, the majority concludes that Reyes's overbreadth challenge no longer presents a live case or controversy. I disagree. Reyes was indicted under the ordinance on December 1, 1997, and prosecuted in the following weeks and months. Reyes alleges that during the time before the ordinance was repealed, his speech was chilled because of this indictment and prosecution. If the ordinance was unconstitutional, Reyes suffered an injury to his First Amendment rights regardless of whether the constitutional infirmity was due to overbreadth or some deficiency in the application of the ordinance to him. This injury, if proven, entitles Reyes to nominal damages. Because Reyes has a live claim for nominal damages, whether the ordinance is unconstitutional, either on its face or as applied, remains a live issue. *See Massachusetts v. Oakes*, 491 U.S. 576, 585-88 (1989) (Scalia, J., joined as to Part I by Blackmun, Brennan, Marshall, and Stevens, J.J., concurring in the judgment in part and dissenting in part) (repeal of statute under which defendant

_____

[3] The factual record as it currently stands is not sufficient to determine whether the ordinance, as it was applied to Reyes, met the requirements for a time, place, and manner regulation. It is unclear, for example, how many people were protesting with Reyes, where they were located in relation to the school, or how heavy the pedestrian traffic was in this area. Accordingly, an as applied time, place, and manner analysis would require a remand to the district court for further factual development.

19

was convicted does not prevent him from making an overbreadth challenge to that statute); *Ruff v. City of Leavenworth, Kansas*, 858 F. Supp. 1546, 1555 (D. Kan. 1994); Richard H. Fallon, Jr., *Making Sense of Overbreadth*, 100 Yale L.J. 853, 856 (1991) ("Although the point is often lost sight of, First Amendment overbreadth doctrine has a constitutionally mandated core, involving the personal right of defendants not to be sanctioned except under a constitutionally valid rule of law."). Because the question of damages remains a live issue, the City of Lynchburg should not be able to insulate its ordinance from overbreadth review simply by repealing it. While the City is correct that the ordinance, now repealed, will not chill any protected speech in the future, Reyes's damages claim requires us to determine whether it did so in the past. *See Comm. for the First Amendment v. Campbell*, 962 F.2d 1517, 1526-27 (10th Cir. 1992). Accordingly, I will now take up Reyes's overbreadth challenge to the ordinance.

As noted above, the First Amendment requires that even a content-neutral permit scheme regulating speech in a public forum be "narrowly tailored to serve a significant governmental interest." *Forsyth*, 505 U.S. at 130. Narrow tailoring in the First Amendment context does not require the government to regulate by using "the least restrictive or least intrusive means" available to achieve its goals, but it does prohibit the government from "regulat[ing] expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward v. Rock Against Racism*, 491 U.S. 781, 798-99 (1989). Similarly, when an ordinance "sweeps too broadly, penalizing a substantial amount of speech that is constitutionally protected," it is unconstitutional due to overbreadth. *Forsyth*, 505 U.S. at 130.

The Lynchburg ordinance requires a permit for any planned "parade, picketing, meeting, assembly, rally, gathering, contest or other assemblage on the public streets, sidewalks, parks, squares or other public places." Code § 25-374.1(a). The ordinance defines "assembly" as "any meeting, gathering or group of persons, animals, or vehicles or a combination thereof having a common purpose, design or goal." Code § 25-374(b). "Picketing" is defined as "peaceful methods of expressing economic, social, political, religious and other issues to the public and which may or may not include the use of signs . . . by more than one (1) person at a specific location." Code § 25-374(c). The

20

ordinance exempts certain activities such as "spontaneous events," "jogging or walking," and "funeral processions." Code § 25-374.1(b).

As the City notes, the goals of the ordinance are apparent on its face. The ordinance is meant to protect the public health, welfare, and safety, specifically, by ensuring that any gathering will not unreasonably interrupt vehicular and pedestrian traffic, will not require a diversion "of so great a number" of fire and police personnel as to impair protection in other parts of the City, will be adequately monitored to ensure orderliness, will not interfere with police or ambulance service, and will not interfere with previously permitted events. Code § 25-374.3(a)(1)-(5). These government interests are significant and appropriate to take into account, and Reyes does not contend otherwise. *See McDonald v. City of Chicago*, 243 F.3d 1021, 1034 (7th Cir. 2001) (significant government interests include "the safety of citizens, and specifically the organized, effective, and safe flow of traffic, including emergency vehicles"). The only question is whether the ordinance is narrowly tailored to serve these interests.

On its face the ordinance encompasses a stunningly broad amount of speech and conduct. Among other things, it requires a permit for any planned gathering in any public place of more than one person (or, indeed, of one person and one or more animals or vehicles, § 25-374(b)) with a common purpose or goal, including but not limited to the expression of economic, social, political, religious or other issues to the public. Code §§ 25-374, 25-374.1. The ordinance as written thus covers about every conceivable type of preplanned social activity in a public place, such as playing fetch with a dog in the park (so long as the game is not spontaneous), meeting friends on a street corner for dinner, or standing with a friend on a city sidewalk holding signs reading "Vote Yes on the School Levy."[4] However, even in a First Amendment facial challenge, courts look not only at the face of the

_____

[4] It is reasonable to wonder whether the ordinance would require a group of racoons to obtain a permit to rummage through garbage bins in an alley. While such a group would constitute an "assembly" under § 25-374(b) (a "group of . . . animals . . . having a common purpose . . . upon any public . . . alley"), the ordinance only prohibits a *person* from conducting or participating in an assembly without a permit. Code § 25-374.1(a).

21

challenged ordinance but also "consider the [government's] authoritative constructions of the ordinance, including its own implementation and interpretation of it." *Forsyth*, 505 U.S. at 131. The City of Lynchburg does not claim to have any authoritative regulations or guidelines that construe the ordinance, but it does point to its history of application of the ordinance, as evidenced by affidavits from city officials and a list of permits granted and denied in 1996 and 1997. It is clear, for example, that the City has never required a permit for a planned game of fetch in a city park. The City argues that the evidence before the district court, including the list of recently permitted activities, makes it clear that the ordinance was applied in a manner that rendered it narrowly tailored to serve the interests identified in the ordinance and that left adequate alternative means of communication. The history of an ordinance's application, without authoritative regulations or a judicial construction, can narrow the scope of an ordinance for the purposes of overbreadth analysis only when "a well-understood and uniformly applied practice has developed that has virtually the force of a judicial construction." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 n.11 (1988). It is questionable whether the City's implementation of the ordinance was so well known and uniformly applied as to have "virtually the force" of judicial construction. Nonetheless, even if the City's argument about narrow implementation is accepted, the ordinance is still unconstitutional.

The City could, of course, require a permit for some of the activities covered by the ordinance without running afoul of the Constitution. These include, for example, the Thousand Man Watch proposed by the Coalition of Concerned African-American Men and the Walk-a-Thon proposed by the March of Dimes. It is apparent from their very names that these activities would likely involve large numbers of people gathering in public places. Such events might reasonably be said to pose legitimate government concerns recognized by the ordinance, such as the impact on pedestrian and vehicle traffic and the potential diversion of police and fire protection from certain parts of the City. *See, e.g.*, *Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1318 (11th Cir. 2000) (permit requirements narrowly tailored to fit city's interests in security, sanitation, and traffic control at event involving around 30,000 participants). However, the City has also issued permits for activities such

22

as informational picketing relating to public mental health issues, picketing by the National Association of Letter Carriers, distribution of New Testaments on the public sidewalk by a local chapter of the Gideons, public protests of gay discrimination, and engaging in "public ministry." The permit list does not reveal the exact size of all of these events or activities, but the record suggests that at least some of them were quite small. Indeed, the City routinely granted permits to lone protesters, such as one man who planned to protest against the United States government at a City intersection, even though the protester indicated that in all likelihood he would be there by himself. Jack Lewis, an officer in the Lynchburg Police Department responsible for issuing permits under the ordinance, testified that in his opinion two people picketing in any public place would require a permit. In contrast, he indicated that two people walking down the street discussing religion would not need a permit. Officer Lewis also indicated that a group of four people standing on the sidewalk outside an abortion clinic declaring their opposition to the practice of abortion would likewise require a permit under the ordinance. In contrast, a group of four people playing horseshoes in the park would not need a permit, even if the event was preplanned. Officer Lewis testified that if someone inquired about a permit, he would probably have that person fill out an application and grant approval for the activity if there was any question that the proposed activity might fall within the ordinance.

I accept the City's representations, which are supported by testimony and the list of permitted activities, that it does not apply the permit ordinance to activities such as playing horseshoes in a public park or discussing religion while walking down the street. Still, the list of activities for which permits have been issued and the testimony describing those activities for which permits would be required demonstrates that the City's application of the ordinance does not come close to rendering it narrowly tailored to achieve the stated goals of preventing interruption of vehicular and pedestrian traffic, maintaining public order, and ensuring adequate monitoring by police and fire department officials. Two peaceful picketers quietly handing out leaflets or holding signs on a sleepy sidewalk or in the middle of a public park pose no threat to vehicular or pedestrian traffic or to public order and require little or no attention from police and fire officials. *See, e.g.*, *Grossman v. City of Portland*, 33 F.3d 1200, 1205-08 (9th Cir.

23

1994) (ordinance requiring permit for any organized demonstration in a public park not narrowly tailored to serve city's interests; ordinance was applied to groups of peaceful protesters as small as eight); *Community for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1392 (D.C. Cir. 1990) (*CCNV*) (regulation requiring permit for two or more people speaking together in any above-ground areas of the Metro held not narrowly tailored; "it is clear that many of these activities would not interfere meaningfully with WMATA's asserted interests.").

It is of no moment that the City routinely granted permits for benign gatherings of only a few people. "Both the procedural hurdle of filling out and submitting a written application, and the temporal hurdle of waiting for the permit to be granted may discourage potential speakers." *Grossman*, 33 F.3d at 1206. *See also CCNV*, 893 F.2d at 1396-97 (Williams, J., concurring in the judgment) ("WMATA has imposed only a license requirement, not an outright ban. But this is not enough to save it . . . . [No government interest] would justify requiring the lone button wearer to go to WMATA's office for a permit."). The Lynchburg ordinance, as implemented by the City, was not narrowly tailored to fit the legitimate interests of maintaining order, the smooth flow of traffic, and the like. Rather, both as actually implemented and as interpreted by City officials, the ordinance "sweeps too broadly, penalizing a substantial amount of speech that is constitutionally protected." *Forsyth*, 505 U.S. at 130. Accordingly, I would hold that the ordinance is unconstitutionally overbroad.

Because the ordinance, even as implemented by the City, clearly fails the narrow tailoring test, I will not address whether it meets the additional requirement of "leav[ing] open ample alternatives for communication." *Id.* I note in passing that the ordinance covers *every* public place, so it is hard to imagine that the ordinance permits adequate alternatives for communication. The City suggests that adequate alternatives exist insofar as Reyes is free to send letters to the editor or to protest on the sidewalk by himself. Although Reyes is certainly free to pursue these methods of communication, the City cannot seriously claim that it can therefore banish groups from speaking in any public place, or require permits for them to do so.

Accordingly, I would hold that the Lynchburg ordinance was unconstitutional because, even as implemented by the City, it was not

24

narrowly tailored to serve the City's interests. Because Reyes alleged that his speech was chilled as a result of his indictment and prosecution under this unconstitutional ordinance, and because the City has made no effort to rebut this allegation, summary judgment should not have been granted to the City on Reyes's claim for nominal damages under § 1983.

I respectfully dissent.

25