STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-11-549
TTW-CUM-2/1/2012

OCCUPYMAINE, et al.,

        Plaintiffs,

    v.                  ORDER

CITY OF PORTLAND,

        Defendant.

**STATE OF MAINE**
**Cumberland, ss, Clerk's Office**

**FEB 01 2012**

**RECEIVED**

Before the court is a motion by plaintiffs OccupyMaine, Frederick Hamilton, Heather Curtis, Harold Brown Jr., and Palma Ryan for a preliminary injunction prohibiting the City of Portland from enforcing certain city ordinances against plaintiffs and from taking action to remove plaintiffs or their belongings from Lincoln Park.

1.     History of Plaintiffs' Occupation

On October 1, 2011 a group of persons acting in solidarity with the Occupy Wall Street demonstration that had begun in New York City in mid-September occupied Monument Square and remained there overnight. They did not seek or obtain any permit from the City for this action. Faced with this situation, the City Manager invited the protesters to move to Lincoln Park and continue their protest encampment there. On or about October 3, 2011 the protesters did move to Lincoln Park, and their encampment has remained in place up to the present.

During October and the first half of November the ranks of the OccupyMaine demonstrators increased. At its high point, one member of the group estimated that there were 48 tents in Lincoln Park containing an estimated 75 people.

During the succeeding days, city officials and members of OccupyMaine were in communication with respect to health and safety concerns raised by the City. The upshot of those discussions was that OccupyMaine, in an effort to address the City's concerns, agreed to apply for a permit from the City Council pursuant to Portland Code section 18-41(b), which requires, *inter alia*, that the City Council review and approve permits for any events in city parks or on public grounds that are proposed to last longer than three consecutive days. OccupyMaine filed its permit application on November 29, 2011 and amended that application on December 5, 2011.

On December 7, 2011 the City Council – after a lengthy hearing – voted to deny the permit application. Subsequently, however, the City agreed not to take any action to remove the members of OccupyMaine so long as OccupyMaine filed a lawsuit by December 19, 2011. The City further agreed, if such a lawsuit was filed, to maintain the status quo until there was a decision on plaintiffs' motion for a preliminary injunction.

Plaintiffs duly filed this action and moved for a preliminary injunction on December 19, 2011. On January 6, 2012 the City filed opposition papers to the motion for a preliminary injunction, and plaintiffs filed reply papers on January 17, 2012. A one-day hearing on plaintiffs' motion was held on January 24, 2012.

By the date of the hearing, with the passage of time and the onset of winter weather, OccupyMaine's activity in Lincoln Park has scaled back to where it largely consists of the presence of tents and signs. Members of OccupyMaine estimate that perhaps 15-20 people are continuing to sleep in Lincoln Park (some on a part-time basis). Although they do not sleep in Lincoln Park, some other supporters participate in OccupyMaine activities, which have involved occasional demonstrations at other locations.

2.    Standard for Preliminary Injunction

In ruling on a preliminary injunction, the court must ordinarily consider four factors: (1) whether the plaintiffs will suffer irreparable injury in the absence of a preliminary injunction; (2) whether that injury outweighs any harm which granting injunctive relief would inflict on the defendant, (3) whether plaintiffs have demonstrated a likelihood of success on the merits (at most, a probability; at least, a substantial possibility); and (4) whether the public interest would be adversely affected by granting the injunction. *Bangor Historic Track Inc. v. Department of Agriculture*, 2003 ME 140 ¶ 9, 837 A.2d 129, 132; *Ingraham v. University of Maine*, 441 A.2d 691, 693 (Me. 1982).

In this case, likelihood of success is the dispositive issue. The evaluation of other factors largely turns on whether plaintiffs have demonstrated a sufficient likelihood of success. Thus, if plaintiffs are able to demonstrate that they have a sufficient likelihood of success on the merits on their claims under the First Amendment or Maine Constitution Article I, Sections 4 and 15, it would follow that an unjustified infringement of their constitutional rights would necessarily constitute irreparable harm and that vindication of plaintiffs' constitutional rights would be in the public interest. *See, e.g., Elrod v. Burns*, 427 U.S. 347, 373 (1976). On the other hand, if plaintiffs have not demonstrated a likelihood of success on their constitutional claims, then the health, safety, and regulatory concerns raised by the City would weigh more heavily in favor of the denial of injunctive relief.

One other issue needs to be addressed at the outset. Plaintiff OccupyMaine is an unincorporated association which, under Maine law, lacks capacity to sue and be sued. *Gulick v. Board of Environmental Protection*, 452 A.2d 1202 n.1 (Me. 1982). At the same time, there is also authority that, as a matter of federal law, unincorporated associations

3

like OccupyMaine have standing to bring suits on behalf of any of their members who would have standing to sue in their own right. *See Freeman v. Morris*, 2011 U.S. Dist. LEXIS 141930 at * 4 n.2 (D. Me. Dec. 9, 2011) (Torresen, J.), citing *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977). Although there is authority for the proposition that lack of capacity is an issue that is waived unless raised in the defendant's answer, *see Gulick*, 452 A.2d at 1202 n.1,[1] the Law Court has also – on its own motion – removed unincorporated associations as parties. *See Allen v. Quinn*, 459 A.2d 1098 n.1 (Me. 1983).

At this juncture, the court need not resolve this issue because there are four individual plaintiffs, and the individual plaintiffs' motion for a preliminary injunction would have to be decided even if OccupyMaine were dropped from the case.

3.     Plaintiffs' Claims Under the First Amendment and Maine Constitution

In the complaint and their arguments to this court, plaintiffs base their request for relief on both the First Amendment of the U.S. Constitution and the Freedom of Speech and Right of Petition clauses in Article I, Sections 4 and 15 of the Maine Constitution. Whether plaintiffs have broader rights under the Maine Constitution than under the First Amendment shall be discussed below. However, since both the First Amendment and Sections 4 and 15 of Article I address freedom of speech, freedom of assembly, and the right of the people to petition the government for redress of grievances, the discussion below will generally refer to those rights as First Amendment rights.

---

[1] The City has not raised this defense in its answer and is not seeking to have plaintiffs' motion resolved on issues of standing or lack of capacity to sue.

4

Plaintiffs have asserted four constitutional claims. In Count I they contend that section 18-18 of the City Ordinances, forbidding individuals from being in a city park after 10 p.m. and before 6 a.m. except for the purpose of traveling through the park, is facially unconstitutional under the overbreadth doctrine. In Count II of the complaint, plaintiffs contend that section 18-18 is unconstitutional as applied to their activities in Lincoln Park. In Count III of their complaint, plaintiffs contend that section 18-41 of the City Ordinances, requiring a permit for any demonstration involving more than 25 persons or lasting more than three days, is an unconstitutional prior restraint. In Count IV of their complaint, plaintiffs contend that the City's denial of OccupyMaine's permit application was based on application of its unconstitutional ordinances, was based on unreasonable time, place and manner restrictions, and was impermissibly based on the content of OccupyMaine's message.

4.    First Amendment Overview

The First Amendment provides that Congress "shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble and to petition the Government for redress of grievances." The First Amendment is equally applicable to state and local government, and its importance to our liberties and our democratic system of government cannot be overstated. It is also undisputed that Lincoln Park is a public forum and as such has a special position in terms of First Amendment protection. *Boos v. Barry*, 485 U.S. 312, 318 (1988).

At the same time, even in a public forum, the right to engage in First Amendment activity, both in the form of actual and symbolic speech, is subject to reasonable time, place and manner restrictions. *See Thomas v. Chicago Park District*, 534 U.S. 316, 322 (2002); *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293

5

(1984). Whether the City has imposed constitutionally valid time, place and manner restrictions is the issue posed in this case.

5.    Expressive Conduct

At the outset there is a question whether plaintiffs' encampment constitutes expressive conduct. If not, the City's ability to regulate that activity would be largely beyond challenge. On this question, while it is undisputed that the actual political discourse engaged in by groups such as OccupyMaine is entitled to constitutional protection, some courts have expressed doubt that activities such as sleeping and camping constitute expressive activity. *See Freeman v. Morris*, 2011 U.S. Dist. LEXIS 141930 at * 15 - * 17 (collecting cases).

Conduct may constitute expressive activity protected by the First Amendment if (1) those engaging in the conduct intend thereby to convey a particular message, and (2) in the surrounding circumstances it is likely that the message would be understood by those who viewed it. *Spence v. State of Washington*, 418 U.S. 405, 410-11 (1974). In this case, although the Occupy protesters also have a number of diffuse and unfocused messages that may not be understood by outsiders, there is one core message that is likely to be understood – that they are protesting against what they perceive as an excess of corporate power and a governmental and economic system that they believe favors the wealthiest one percent of the population at the expense of the remaining 99 percent. Moreover, the court concludes from the evidence submitted and the testimony at the hearing that the presence of their encampment in Lincoln Park can be understood as part of their message in at least two respects – (1) it is designed to resemble other encampments, originating with Occupy Wall Street, that have a similar protest message and that have received considerable publicity; and (2) it is intended to demonstrate that

6

participants feel so strongly about their views that they are willing to sleep outside to demonstrate their commitment.[2]

Given that expressive conduct is involved here, it is the City's burden to demonstrate that its restrictions are constitutional. *Clark v. Community for Creative Non-Violence*, 468 U.S. at 294 n.5.

### 6. Time, Place, and Manner Restrictions

Where expressive conduct is involved, the next question is whether the challenged regulation or ordinance is related to the suppression of free expression. *Texas v. Johnson*, 491 U.S. 397, 403 (1989). If the ordinance is directed at expression, then it will be subjected to judicial scrutiny under a strict standard. *Id.* If the ordinance is not directed at expression, then it will be analyzed under a less stringent standard. *Id.* Time, place, and manner restrictions have been upheld against challenges under the First Amendment[3] where they have adequate standards to guide official discretion, where they are content-neutral, where they are narrowly tailored to serve a substantial governmental interest, and where they leave open alternate channels for communication of plaintiffs' message. *See Thomas v. Chicago Park District*, 534 U.S. at 322-23; *Clark v. Community for Creative Non-Violence*, 468 U.S. at 293-94, 296.

In this case, plaintiffs do not contend that the applicable City ordinances are expressly directed at speech or that they are not content-neutral. Moreover, section 18-

---

[2] Obviously some of the conduct involved in camping in Lincoln Park is not expressive but facilitative. *See Clark v. Community for Creative Non-Violence*, 468 U.S. at 296. However, the presence of an expressive component requires the court to evaluate the validity of the City's time, place and manner regulations as they impact plaintiffs' expressive conduct and symbolic speech.

[3] The issue of whether a different analysis should apply under the Maine Constitution is considered at pp. 21-23 below.

7

44 of the City ordinances provides standards under which OccupyMaine's permit application was judged by the City Council. That section provides as follows:

**Sec. 18-44. Standards for issuance.**

(a)     The permitting authority shall issue a permit if it finds:

   (1)     The proposed event or activity shall not endanger the health and safety of all persons who visit the park;
   (2)     Adequate parking facilities exist and are available to accommodate the proposed event or activity in the park;
   (3)     Adequate sanitary facilities exist and are available to accommodate the proposed event;
   (4)     The event or activity shall not cause damage from destruction or overuse to or overuse of' the grounds, equipment, vegetation, buildings, fences or other amenities in the park;
   (5)     The proposed event or activity would not unreasonably disturb persons who occupy land which is adjacent to such park; and
   (6)     The park or portion thereof desired has not been reserved for other use at the day and hour required in the application.

(b)     When issuing the permit, the permitting authority may designate the specific area within the park or the park system where the event shall be permitted to take place, based upon the foregoing criteria.

These standards are very similar to the standards in the Chicago ordinance that was upheld by the Supreme Court in *Thomas v. Chicago Park District*. That decision rejected the claim that Chicago's permit requirement constituted an unlawful prior restraint without adequate procedural safeguards or an adequate check on the discretion of the permitting authority. *See* 534 U.S. at 318 n.1, 323-24. Moreover, the Supreme Court, in both *Clark v. Community for Creative Non-Violence* and *Thomas v. Chicago Park District*, broadly reaffirmed that there is a substantial governmental interest in regulating the use of parks for the safety and convenience of the public, to allow the parks to be enjoyed by all citizens, and to protect the parks from damage. 534 U.S. at

8

322; 468 U.S. at 296.[4] The Court has also emphasized that the requirement that regulation of a public forum must be "narrowly tailored" does not require a municipality to adopt the least restrictive form of regulation. *Ward v. Rock Against Racism*, 491 U.S. 781, 797-800 (1989).


7. Plaintiffs' Challenge to Ordinance Section 18-18

Plaintiffs have focused their legal arguments primarily on section 18-18 of the Portland Ordinance, which provides in pertinent part as follows:

> [N]o person shall stop, loiter, be or remain in any of the parks of the city or in any of the paths, drives, streets, boulevards or roadways of the parks between the hours of 10:00 p.m. and 6:30 a.m. of the day immediately following, except for the purpose of traveling across or through such parks . . . unless said person or persons has the prior written authorization of the city manager to be in said park or parks or their drives, streets, boulevards, promenades or roadways during the aforementioned hours.

Plaintiffs attack this ordinance on two fronts. First, they argue that if it is interpreted as an outright ban on presence within parks after 10 p.m., it is overbroad because it keeps them from engaging in First Amendment activity during late evening and early morning hours. Second, recognizing that the city manager could, under the terms of the ordinance, authorize persons engaging in First Amendment activity to hold a demonstration in Lincoln Park between 10 p.m. and 6:30 a.m., they argue that

---

[4] As stated in *Thomas*:
> [T]he object of the permit system (as plainly indicated by the permissible grounds for permit denial) is not to exclude communication of a particular content, but to coordinate multiple uses of limited space, to assure preservation of park facilities, to prevent uses that are dangerous, unlawful, or impermissible under the Park District's rules, and to assure financial accountability for damage caused by the event. As the Court of Appeals well put it: "To allow unregulated access to all comers could easily reduce rather than enlarge the park's utility as a forum for speech."
534 U.S. at 322.

providing unfettered discretion to the city manager is impermissible because such authorization could be denied based on the content of the message.

There are several problems with plaintiffs' arguments. The first is that section 18-18 has not been utilized to prosecute plaintiffs or any other members of OccupyMaine or to prevent them from engaging in any First Amendment activity. The OccupyMaine protest began in Monument Square (without complying with section 18-18)[5] and then moved to Lincoln Park at the express invitation of the city manager, who exercised his authority under section 18-18 to allow OccupyMaine to remain in Lincoln Park after 10 p.m. from the beginning of October until the City Council's denial of OccupyMaine's permit application on December 7, 2011. He has since allowed OccupyMaine to remain pending the outcome of the instant motion.

It was only after the City Council denied OccupyMaine's permit application that the city manager advised plaintiffs that the City would – in the future – expect members of OccupyMaine to comply with section 18-18. In contrast, in the cases cited by plaintiffs in support of their facial and as applied challenges to section 18-18, either the challenged regulation was specifically directed at expression, *e.g.*, *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988),[6] or the complaining parties had already been prevented, restrained, or prosecuted based on the regulations they were challenging. *See, e.g., Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 148, 157 (1969) (plaintiff criminally convicted of marching without a permit; record in a companion

---

[5] As far as the court can tell from the existing record and testimony at the January 24 hearing, none of the individual plaintiffs were part of the original protest in Monument Square. All of those individuals joined the encampment (some on a part-time basis) after it moved to Lincoln Park.

[6] In *City of Lakewood*, the challenged regulation applied only to newsracks and not to other structures on public property, *see* 486 U.S. at 755, and the Supreme Court emphasized that the regulation was "directed narrowly and specifically at expression or conduct commonly associated with expression: the circulation of newspapers." 486 U.S. at 760.

case demonstrated that the city's commissioner of public safety – one Eugene "Bull" Connor – had flatly denied all permits.)

Turning to the merits of plaintiffs' challenge to section 18-18, the submissions of both parties are unclear whether that section should be interpreted as an outright ban on presence in city parks after 10 p.m. or as a bar to any non-transitory presence in city parks absent authorization from the City Manager.[7] In either case, however, the court does not find that plaintiffs' challenge to section 18-18 is likely to succeed on the merits.

For one thing, facial challenges to a regulation on the ground of overbreadth must be based on a showing that the alleged overbreadth is "substantial" when judged against the all other applications of the regulation. *See New York v. Ferber*, 458 U.S. 747, 770-72 (1982). In this case plaintiffs contend that the park closure rule infringes on any First Amendment activity that may take place in public parks after 10 pm. However, with very few exceptions, the vast majority of activity in city parks – including the vast majority of First Amendment activity conducted in public parks – does not take place between the hours of 10 pm and 6:30 am.[8] Accordingly, the alleged overbreadth falls short of being substantial. As a result, to the extent that section 18-18 is interpreted as setting a mandatory closing time of 10 p.m. for city parks, it is likely that such a provision would be upheld. *See Freeman v. Morris*, 2011 U.S. Dist. LEXIS 141930 at * 34 - * 37.[9]

---

[7] *See* Plaintiffs' Motion for Preliminary Injunction dated December 19, 2011 at 18, 21 (complaining of "outright ban"); *id.* at 18, 28 (complaining of "unbridled discretion"); Defendant's Opposition to Motion for Preliminary Injunction dated January 6, 2012 at 23 (characterizing section 18-18 as setting a content neutral closing time); *id.* at 26 (after hours use may be allowed if permit standards met).

[8] Only the instant case and certain demonstrations against homelessness come to mind as First Amendment activity as to which a late night presence in city parks would be sought.

[9] Portland does not currently have a rule forbidding camping in city parks but if it were to institute such a rule, that too would be likely to survive a constitutional challenge. *See Clark v. Community for Creative Non-Violence*, 468 U.S. at 294, 296.

11

Alternatively, to the extent that section 18-18 is interpreted as requiring the equivalent of a permit from the city manager, it is also likely that section 18-18 would survive constitutional challenge. To be sure, there is authority for the proposition that subjecting First Amendment activity to the unfettered discretion of government officials is constitutionally suspect. *E.g., Shuttlesworth v. City of Birmingham*, 394 U.S. at 151, 153. However, where adequate standards exist to govern their issuance, permit requirements have been upheld. *Thomas v. Chicago Park District*, 534 U.S. at 318 n. 1, 323-24. In this case the court concludes that the city manager's discretion under section 18-18 is not unrestrained but should be interpreted as subject to the standards for issuance of a permit under section 18-44.

As noted above, the standards contained in section 18-44 are similar to those upheld in *Thomas*. Moreover, where a narrowing construction of governmental regulations or ordinances is available, the court should adopt that interpretation unless the record contains evidence that the ordinances or regulations in question have been administered in an impermissible or discriminatory fashion. *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941); *New England Regional Council of Carpenters v. Kinton*, 284 F.3d 9, 26 (1st Cir. 2002). In *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. at 770 n. 11 (1988), the Supreme Court directed courts to presume any narrowing construction or practice to which a statute or ordinance is "fairly susceptible." *Accord, New England Regional Council v. Kinton*, 284 F.3d at 26.

On the current record before the court, section 18-18 is fairly susceptible to the limiting construction that any decision by the City Manager to authorize activity in city parks after 10 p.m. is subject to the standards contained in section 18-44. That interpretation is consistent with the sequence of events in this case, where the City Manager expressed his intention to invoke section 18-18 against members of

12

OccupyMaine only after the City Council had made findings that OccupyMaine's encampment did not meet the standards set forth in section 18-44.

Any further exploration of the issues raised by section 18-18, however, can be left for another day. This is because OccupyMaine's continued presence in Lincoln Park does not turn on the constitutional validity of section 18-18 but on the outcome of OccupyMaine's challenge to the City Council's denial of its permit application. Thus, if section 18-18 did not exist, plaintiffs still would not be entitled to a preliminary injunction so long as (1) OccupyMaine was validly subject to the permit requirements in Ordinance sections 18-40, 18-41 and 18-44, (2) the City did not violate the First Amendment by applying those permit requirements to OccupyMaine, and (3) OccupyMaine's permit application was validly denied by the City Council.

8.     Application of Ordinance Sections 18-40, 18-41(b), and 18-44

At the outset, section 18-40(a) of the city ordinances provides that a permit is required for any event in a park which 25 or more persons might be expected to attend. For events of 25 or more persons, the City Director of Parks and Recreation or his designee shall be the permitting authority. § 18-41(a). For events involving 2,000 or more persons or for events lasting longer than three consecutive days, regardless of the number of persons involved, the City Council shall be the permitting authority. § 18-41(b). In both cases the standards for issuance of a permit are set forth in § 18-44 (quoted above at p. 8).

In addition to the standards in section 18-44, there are other relevant provisions relating to permit applications under sections 18-40 *et seq.* Under section 18-45(b) anyone issued a permit is responsible for keeping the park clean and free from debris. Under section 18-45(c), if any structures are to be erected in the park, the permittee shall

13

be responsible for complying with building code requirements, including the requirements applicable to temporary structures. In addition, permittees are also required to post a deposit sufficient to pay for any damage to the park and for any required restoration of the park grounds. § 18-46.[10]

Under *Thomas v. Chicago Park District*, as discussed above, similar permit requirements have been upheld against claims that they constituted an unconstitutional prior restraint and that they did not have adequate standards to constrain permitting decisions. 534 U.S. at 322-24. As in *Thomas*, Portland's permit requirements are not just applicable to political activists, but to "picnicker[s] and soccer player[s]" if specified limits (in this case 25 persons or an event lasting more than three days) are exceeded. See 534 U.S. at 322.[11] Moreover, the permit requirements in this case are tailored with sufficient narrowness to meet the city's interests in protecting the health and safety of the public, protecting the park from damage, and preserving the park for the use and enjoyment of all of its citizens. *See Clark v. Community for Creative Non-Violence*, 468 U.S. at 296-98; *New England Regional Council v. Kinton*, 284 F.3d at 26-29.

This is particularly true because the Supreme Court has held that, contrary to plaintiffs' arguments in this case, the First Amendment does not require that a

---

[10] In addition, permittees are required to furnish evidence of liability insurance coverage, with the proviso that First Amendment activities (other than commercial speech) are exempt from the liability insurance requirement but only if the permit covers eight hours or less in one calendar day. § 18-45(e). Because OccupyMaine's application was denied on other grounds, the court does not need to reach the validity of this provision.

[11] In this connection, plaintiff's reliance on the D.C. Circuit decision in *Boardley v. U.S. Department of the Interior*, 615 F.3d 508 (D.C. Cir. 2010), is misplaced. *Boardley* found the government's interests in protecting park facilities and protecting the health and safety of park visitors to be substantial, 615 F.3d at 519-20, and found only one invalidity in the park service permit scheme – that it applied to lone individuals and small groups as well as larger groups. In the case at hand, Portland requires permits or written authorization only for persons seeking to be present in parks at night, for groups of 25 or more, and for events longer than three days. Presence in parks at night reasonably requires notice to the city because some police protection or other safety response may be required. A permit requirement for large groups and for multiday events is appropriate because of the increased potential for damage to the parks, for interference with other park users, and for health and safety issues to arise.

14

governmental entity fashion the least restrictive possible alternative in each particular situation. *Ward v. Rock Against Racism*, 491 U.S. at 800 ("So long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative"). *See Clark v. Community for Creative Non-Violence*, 468 U.S. at 230-31.

9. The City Council's Action

Since plaintiffs are not likely to succeed on their First Amendment challenge to the permit requirements in sections 18-40, 18-41, 18-44 and 18-45, their motion for a preliminary injunction turns – at least for purposes of their federal constitutional claims – on whether they have a sufficient likelihood of success on their claim that the City Council's decision to deny OccupyMaine's permit application was constitutionally invalid.

At the outset, plaintiffs have presented no evidence that in denying OccupyMaine's permit application, the City Council was hostile to or influenced by the content of OccupyMaine's message. Plaintiffs argue, however, that the Council did not adequately consider their application but denied it solely because of the general rule in section 18-18 against presence in the city parks after 10 p.m. without authorization from the city manager.

The transcript and the video recording of the City Council proceedings do not support plaintiffs' arguments. While there were some statements made by city councilors to the effect that they would adhere to the terms of their ordinances, those comments demonstrate that those councilors believed they were being asked – in the

15

name of the First Amendment – to make exceptions to the health, safety and regulatory criteria in section 18-44, and that they were unwilling to do so.

The Mayor and at least three members of the council expressly stated the view that OccupyMaine's permit application did not meet the requisite health and safety criteria.[12] Another member of the council endorsed that view by implication.[13] Moreover, the evidence in the record and at the January 24 hearing is sufficient to support a finding that the requirement of section 18-44(1)(a) – that the proposed event "shall not endanger the health and safety of all persons who visit the park" – had not been met on December 7 and that those issues have not been remedied since.

Specifically, the record reflects that there has been a significant increase in police calls to Lincoln Park since the encampment began. Those calls have resulted, *inter alia*, in an arrest for aggravated assault, several arrests for drug possession, several arrests for domestic violence assault, several charges for simple assault, several arrests for criminal threatening, a fugitive from justice arrest, several arrests for criminal trespass, and a number of arrests for disorderly conduct. Some of the persons arrested identified themselves as members of OccupyMaine. Others did not but had apparently been attracted to the encampment.

There is also evidence to support a finding that other health and safety issues had not been adequately addressed at the time of the December 7 Council hearing and have not been fully addressed to date. The record reflects that at various times during the encampment there have been various fire code violations, including open fires, use

---

[12] *See* City Council proceeding of December 7, 2011, Disc 3 transcription at 28, 31-32, 34, 37, 59-60.

[13] *Id.* at 41 ("I would like to believe . . . that an application can be submitted that would meet our legitimate public safety – health, safety, and welfare concerns while also protecting your free speech"). Another councilor did not mention health and safety specifically but did state, "[I]f you read the five standards, for issuance, it's clear that they can't be met." *Id.* at 22.

16

of propane heaters in tents, smoking in tents, and fire hazards in the form of hay bales and wood pallets. OccupyMaine has made an effort to remedy these conditions but has not been completely successful. There is also evidence in the record of occasions where significant trash and debris was strewn around the park. Once again, OccupyMaine has made commendable efforts to address these conditions when they occur but has not been able to prevent them from recurring intermittently.

In addition, OccupyMaine's tents and other shelters do not meet the City's code requirements for temporary structures, and OccupyMaine has also erected at least one structure, a geodesic dome, that does not meet code requirements. It is notable that in its amended permit application OccupyMaine acknowledged that it did not meet certain code requirements (*e.g.* the requirement that only flame retardant tents and tarps be used) but asked for 30 days to meet those requirements if its permit application was approved. *See* OccupyMaine's Amended Petition dated December 5, 2011 at Sections III.7 – III.9. In many other respects, OccupyMaine's amended permit application did not assert that the City's criteria had been met but rather that OccupyMaine would attempt to meet those criteria in the future.[14] Similarly, OccupyMaine's permit application pledged to raise $2,500 at the end of six months for the restoration of Lincoln Park, but the City estimates that the amount necessary to repair damage to the park and to restore the grounds will be between $4,000 and $7,000.

In sum, there is adequate evidence to support the City Council's denial of OccupyMaine's permit application because it did not meet the requisite health and safety criteria, because the encampment posed a potential for damage from overuse of

---

[14] *See, e.g.,* Amended Petition Sections III.5 (proposing future submission of application for license to serve food), III.6(a) (proposing future submission of application for building permit for geodesic dome), III.10 (proposing to obtain liability insurance or seek waiver of liability insurance requirement in the future).

the park grounds, and because OccupyMaine had not met various other code requirements.

During their remarks at the time the permit application was denied, neither the Mayor nor any members of the council referred to the prohibition in section 18-18 on presence in the city parks after 10 p.m.[15] Several councilors did express their objections to OccupyMaine's proposal to continue its encampment on a 24/7 basis for six months or more. However, those objections were not based on the conduct of expressive activities during evening hours but rather on the duration of the encampment, its residential nature, and the effect it would have of excluding other citizens from the park.

In this connection, OccupyMaine's application to the City Council demonstrates that it was not just seeking a permit but was also expressly petitioning the City Council to permanently designate two-thirds of Lincoln Park as a perpetual 24/7 free speech and assembly area. *See* December 5, 2011 Amended Petition § II. Moreover, OccupyMaine was not proposing the free speech area as a "Hyde Park Corner" open to all viewpoints but was seeking exclusive use of that designated area for continuation of its encampment for a period of 179 days "subject to the right to seek renewal and/or extension of that time period through the appropriate process." *Id.* §§ III.1-III.4.

Considered in this context, it is evident that the statements of various city councilors reflected their objections to OccupyMaine's request to be granted exclusive

---

[15] Section 18-18's restriction against being in city parks after 10 p.m. was referred to in a subsequent statement issued by the Mayor on behalf of the Council on December 15, 2011 – more than a week after the city council's vote. That document distinguished between OccupyMaine's permit application – which was denied for failure to meet the standards contained in § 18-44 – and its accompanying petition to create a 24-hour free speech zone. The overnight restriction in § 18-18 was referenced with respect to the latter issue.

use of a major portion of Lincoln Park for an extended and perhaps indefinite period.[16] Those objections are not invalid under the First Amendment. Plaintiffs have offered no authority for the proposition that, in order to communicate their message, they are entitled to commandeer a public forum for an extended period in a 24-hour encampment that necessarily excludes other citizens from their customary use of the park.[17] At least one court has concluded the contrary – that the seizure of a public forum is not protected by the First Amendment. *See Occupy Boston v. City of Boston,* Civil Action No. 11-4152-G, order dated December 7, 2011 at 11-16 (Mass. Super. Ct.). This is consistent with the Supreme Court's emphasis in *Thomas v. Chicago Park District* on the role of park authorities in regulating parks for the benefit of all citizens, *see* 534 U.S. at 322-323, and its statement that granting waivers of permit requirements for favored speakers would be unconstitutional. *Id.* at 325.

10.  Other Available Channels of Communication

As discussed above, a final issue to be considered in reviewing any time, place, and manner restrictions that limit First Amendment activity is whether those restrictions leave open ample alternative channels for communication. *Thomas v. Chicago Park District,* 534 U.S. at 323.

---

[16] *See* City Council Proceedings of December 7, 2011, Disc 3 transcript of 14-16, 19-20, 27-29, 32-33, 35, 48. Several councilors likened OccupyMaine's application to a request to rezone the park for residential use. Those councilors and others also expressed significant concerns – if OccupyMaine's application were granted – with respect to the right of other speakers to use the free speech zone and whether, if it permitted an encampment in the free speech zone as requested by OccupyMaine, the City would in effect be licensing OccupyMaine to exclude opposing views from the free speech zone.

[17] The individual plaintiffs and many members of OccupyMaine may not have the intent to exclude other viewpoints, but there is evidence that some OccupyMaine participants have confronted other citizens and sought to exclude them from the park. Moreover, whatever its intent, the presence of the OccupyMaine encampment necessarily prevents or discourages other citizens from using the park – either as a public forum or simply for enjoyment.

In this case City Council's denial of OccupyMaine's permit application does not prevent plaintiffs from organizing demonstrations and protests on public streets and sidewalks and in public spaces throughout the city. The City has previously granted OccupyMaine three or four permits for events in Congress and Monument Squares, and the evidence before the court demonstrated that in the last several months – while maintaining their signs and tents in Lincoln Park – OccupyMaine's rallies have mainly occurred off site, at City Hall and other locations.

Moreover, although OccupyMaine's application to continue its encampment has been denied, that denial does not preclude OccupyMaine and the individual plaintiffs from engaging in First Amendment activity even in Lincoln Park so long as that activity does not include a renewal of its encampment. Under these circumstances, there are adequate alternative channels of communication available to OccupyMaine and its members. Specifically, although the court has concluded above that the existence of OccupyMaine's tent city is expressive conduct, the requirement that there be alternative channels of communication does not mean that the city must offer a central public space where OccupyMaine can continue a visible encampment. The City is obligated to allow the members of OccupyMaine to exercise their freedom of speech, their freedom to assemble, and their right to petition. It is not obligated to allow OccupyMaine to communicate its message in a manner that conflicts with content-neutral time, place and manner regulations that serve substantial governmental interests.

One final point should be made in this connection. After the December 7 City Council vote to deny the permit application and accompanying petition for a continued encampment, the City has made several statements indicating that, unless enjoined by this court, it intends to enforce the prohibition in section 18-18 against presence in the city parks after 10 p.m. The court interprets those statements as applicable to any

20

attempt by members of OccupyMaine to continue or renew their encampment. OccupyMaine has not sought authorization to hold a nighttime demonstration or vigil in Lincoln Park (minus tents and other camping gear and without resuming its encampment). If members of OccupyMaine were to seek such authorization, and if that authorization were to be denied on grounds that infringed First Amendment rights, the court remains available to consider that issue and to provide any redress to which OccupyMaine members may be entitled.[18]

### 11. Maine Constitution, Art. I, Sections 4 and 15.

Both plaintiffs and the amicus brief submitted by the American Civil Liberties Union of Maine argue that if the court finds that plaintiffs have not shown a likelihood of success under the First Amendment, it should consider whether they are entitled to greater rights under Article I, Section 4 and Article I, Section 15 of the Maine Constitution. The court concludes that, with respect to the issues presented in this case, it is likely that the Law Court would interpret the Maine Constitution as coextensive with the First Amendment, and that plaintiffs therefore have not shown a sufficient likelihood of success on their state constitutional claims.

This is true for three reasons. First, there is no material difference between the relevant language of the federal and state constitutions. The First Amendment guarantees freedom of speech and the right of the people to peaceably assemble and to petition the government for redress of grievances. Article I, Section 4 of the Maine

---

[18] As noted above, there is authority for the proposition that the City could amend § 18-18 to close its parks to all activity after 10 p.m. except for persons travelling through. There is also authority for the proposition that the City could institute a no camping rule in city parks. The City has not taken either of those measures, and the court's preliminary views of the constitutionality of such measures would necessarily be subject to further consideration if the City were to take those steps.

21

Constitution replicates that free speech guarantee, stating: "Every citizen may freely speak, write and publish sentiments on any subject, being responsible for the abuse of this liberty . . . " Article I, Section 15 of the Maine Constitution then replicates the First Amendment's provisions relating to the right to assemble and petition for redress of grievances:

> The people have a right at all times in an orderly and peaceable manner to assemble to consult upon the common good, to give instructions to their representatives, and to request, of either department of the government by petition or remonstrance, redress of their wrongs and grievances.

The court sees no principled distinction between the language in the First Amendment and the language in Article I, Sections 4 and 15.

Second, while the Law Court has never expressly held that the First Amendment and Article I, Sections 4 and 15 are coextensive in all respects, it has never drawn any distinction between the Maine Constitution and the Federal Constitution where First Amendment rights are concerned, and it has uniformly drawn on federal constitutional precedents in interpreting Sections 4 and 15 of Article I. *See, e.g., City of Bangor v. Diva's Inc.*, 2003 ME 51 ¶ 11 and n.4, 830 A.2d 898, 902 and n.4; *State v. Janisczak*, 579 A.2d 736, 740 (Me. 1990); *City of Portland v. Jacobsky*, 496 A.2d 646, 648-49 (Me. 1985); *Solmitz v. Maine School Admin. District No. 59*, 495 A.2d 812, 816 n.2 (Me. 1985).[19] In particular, the Law Court has drawn no distinction between state and federal constitutions in upholding time, place and manner restrictions under Article I, Sections 4 and 15. *See State v. Armen*, 537 A.2d 1143, 1145 (Me. 1988); *State v. Chiapetta*, 513 A.2d 831, 832-33 (Me. 1986).

---

[19] This is consistent with the Law Court's observation that "we have traditionally exercised great restraint when asked to interpret our state constitution to afford greater protections than those recognized under the federal constitution." *Bayley v. Raymond School Department*, 1999 ME 60 ¶ 13, 728 A.2d 127, 132, quoting *State v. Buzzell*, 617 A.2d 1016, 1018 n.4 (Me. 1992).

Finally, in arguing for a broader interpretation of Article I, Sections 4 and 15, the amicus brief suggests that the court should adopt the reasoning of the dissent in *Clark v. Community for Creative Non-Violence*, 468 U.S. at 301-16 (Marshall, J.). In that dissent Justice Marshall argued for stricter scrutiny as to whether the challenged government regulations advance a substantial government interest. Applying that level of scrutiny to the issues in the *Clark* case, he concluded that the camping ban instituted by the park service had not been adequately justified.

If the Law Court reached this issue, however, it is more likely that it would be inclined to heed the view of the majority in *Clark* that the constitution does not endow the judiciary with the authority or the competence to supplant municipal officials in managing city parks, in evaluating health and safety risks, and in judging how much protection of park grounds is necessary. *See* 468 U.S. at 299.[20] This counsels against the strict scrutiny proposed in the *Clark* dissent.

## Conclusion

There is no doubt that the individual plaintiffs and other members of OccupyMaine are sincere in their desire to communicate their message and to engage in First Amendment activity. They have also made a sincere and commendable effort to address the City's health and safety concerns. Ultimately, however, the City Council concluded they had fallen short in those issues, and that finding is supported by the record before this court.

Moreover, plaintiffs' assertion of a right to engage in continuous and exclusive occupation of an area within a public park for an extended period would, as members

---

[20] Moreover, the health and safety concerns that are apparent from the record in this case are stronger than the administrative concerns that were found sufficient to justify the camping ban in *Clark*.

23

of the City Council observed, conflict with the rights of others who might wish to use the park for their own First Amendment activities or for other purposes. The City is not obliged to agree to such an occupation. If it did, it would be difficult to see why any other groups wishing to communicate their views would not have an equal right to permanently commandeer public spaces for that purpose.

Plaintiffs' motion for a preliminary injunction is denied. The clerk is directed to incorporate this order in the docket by reference.

DATED:     January 31, 2012

Thomas D. Warren
Justice, Superior Court

OCCUPYMAINE ET AL VS CITY OF PORTLAND MAINE
UTN:AOCSsr  -2011-0124534                         CASE #:PORSC-CV-2011-00549
-----------------------------------------------------------------------------

SEQ VO                                REPRESENTATION  TYPE        STATUS

01 0000007632 ATTORNEY:BRANSON, JOHN H

ADDR:482 CONGRESS STREET SUITE 304  PO BOX 7526 PORTLAND ME 04112

| F FOR:OCCUPYMAINE | PL | RTND | 12/19/2011 |
|---|---|---|---|
| F FOR:HAROLD JOSEPH BROWN, JR | PL | RTND | 12/19/2011 |
| F FOR:HEATHER LINNET CURTIS | PL | RTND | 12/19/2011 |
| F FOR:PALMA E RYAN | PL | RTND | 12/19/2011 |
| F FOR:FREDERICK DEESE HAMILTON | PL | RTND | 12/19/2011 |

02 0000001120 ATTORNEY:DUNLAP, MARK

ADDR:415 CONGRESS STREET PO BOX 4600 PORTLAND ME 04112-4600

| F FOR:CITY OF PORTLAND MAINE | DEF | RTND | 01/06/2012 |
|---|---|---|---|

03 0000001121 ATTORNEY:WOOD, GARY C

ADDR:389 CONGRESS STREET PORTLAND ME 04101

| F FOR:CITY OF PORTLAND MAINE | DEF | RTND | 12/20/2011 |
|---|---|---|---|

04 0000009826 ATTORNEY:MCALLISTER, PATRICIA A

ADDR:109 MIDDLE STREET PORTLAND ME 04101

| F FOR:CITY OF PORTLAND MAINE | DEF | RTND | 12/20/2011 |
|---|---|---|---|